**Eddie M. HERRERA, Appellant**

v.

**The STATE of Texas, Appellee**

**NO. 01-16-00403-CR**

Court of Appeals of Texas,
Houston (1st Dist.).

Opinion issued July 13, 2017

Discretionary Review Refused
November 1, 2017

Nicole DeBorde, BIRES SCHAFFER & DEBORDE, JPMorgan Chase Bank Building, 712 Main Street, Suite 2400, Houston, Texas 77002, for Appellant.

Kim Ogg, District Attorney—Harris County, 1201 Franklin, Suite 600, Houston, TX 77002, Clint Morgan, Assistant District Attorney, Harris County, Texas, 1201 Franklin, Suite 600, Houston, TX 77002, for Appellee.

Panel consists of Justices Higley, Bland, and Brown.

## OPINION

Harvey Brown, Justice

Eddie Herrera and J.G. (pseudonymously referred to as "Jessica") attended Jessica's high school prom together and spent that night in a nearby hotel room. By the next morning, Jessica was dead. As part of the investigation of her death, her bodily fluids were tested for alcohol and narcotics and an autopsy was performed. The toxicology tests revealed large amounts of alcohol as well as Hydrocodone in her system. The autopsy revealed significant injuries to Jessica's neck that would have required a large degree of force to achieve, including large hemorrhages in multiple layers of muscle tissue in both the front and the back of her neck.

The police investigation led to charges against Herrera. Based on evidence of significant injuries to Jessica's neck and his statement to investigators that he squeezed Jessica's neck the night of the prom during sexual intercourse, he was charged with first-degree felony aggravated assault with a deadly weapon (his hands) on an individual with whom he had a dating relationship.[1] A jury convicted Herrera and assessed punishment at 25 years' confinement.

In four issues, Herrera contends that the evidence was insufficient to support his conviction and that the trial court erred by charging the jury under an erroneous mens rea standard.

We affirm.

## Background

Jessica was a 17-year-old high school senior when she invited 18-year-old Herrera, whom she had known for several years, to her high school prom. Without telling Jessica's mother, Herrera's mother, Melissa Martinez, helped the pair secure a hotel room, narcotics, and alcohol for prom night, and then Martinez presented Jessica's mother with a cover story for the young couple. When Martinez did not return Jessica home on time, Jessica's mother repeatedly tried to call Jessica, Herrera, and Martinez, but none responded. In the middle of the night, Jessica's mother contacted the police.

Around 9:00 a.m. the next morning, Martinez called for emergency assistance in the pair's hotel room, reporting to the emergency operator that Jessica was cold and not breathing. The emergency dispatcher instructed Martinez to perform CPR on Jessica. The Houston Fire Department arrived within minutes to find that Jessica was dead.

When Sergeant M. Miller arrived at the hotel, he noted that Jessica's clothing appeared as though it had been put on haphazardly and "[d]idn't look like she had put [it] on herself." According to Miller, there were no signs of a struggle in the hotel room and neighboring occupants did not hear screams or anything that indicated a struggle.

J. Oliphant with the Houston Police Department Crime Scene Unit investigated

---

1. *See* TEX. PENAL CODE §§ 12.32, 22.02.

the scene. He testified that he found an empty bottle of Crown Royal in the trash and another half-empty bottle repackaged in the Crown Royal box inside Jessica's bag. Oliphant also found prescription bottles in the room.

At the hotel, Miller spoke with Herrera and his mother together and then individually. Herrera gave Miller an overview of the night. According to Herrera, he and Jessica checked into the hotel, went to the prom for a couple hours, went back to the room, had sexual intercourse, and went to sleep. When he woke up the next morning, he found Jessica dead. Miller asked Martinez and Herrera to be interviewed in the homicide division offices.

During questioning at the homicide division offices later that day, Herrera told Miller that he woke up around 7:00 a.m., saw Jessica's dead body, and called his mother in a panic. Martinez, who was already near the hotel, arrived quickly. Herrera and his mother dressed Jessica's naked body, then Martinez called 9-1-1. The emergency call was placed around 9:10 a.m.—two hours after Herrera found Jessica and called Martinez.

Herrera indicated to the investigators that Jessica had brought all the alcohol as well as any Hydrocodone she consumed that night. During a break in the questioning, though, investigators allowed Martinez and Herrera time to talk between themselves in the interview room. That portion of the videotape, along with the remainder of the interview, was played to the jury. During their conversation, Martinez told Herrera to be truthful about her providing the Hydrocodone and alcohol. From that point on, Herrera told the police that he and his mother were involved in bringing the alcohol and Hydrocodone to the hotel room.

During further questioning, Herrera told the investigators that he and Jessica had consensual intercourse in the hotel room after the prom, but he made no mention of placing any pressure on her neck during the encounter.

Miller testified that at no point during the interview did Herrera become emotional or show any signs of being upset.

Dr. Haden-Pinneri, a medical examiner for the Harris County Institute of Forensic Sciences, performed an autopsy on Jessica's body the day after she was found. In her external examination of Jessica, she found bruises on her neck, face, and legs. In her internal examination of Jessica's body, Pinneri found extensive injuries to Jessica's neck, anal trauma, and petechiae in Jessica's eyes, which Pinneri explained are burst blood vessels that can be markers of "potential asphyxia or an absence or reduction of blood flow that goes to the brain" and are often seen in cases involving neck-compression injuries. She further testified that these petechial hemorrhages are not typical of drug overdose deaths absent an unusual post-death body position, which Jessica did not exhibit.

The presence of petechiae led Pinneri to closely examine Jessica's neck for evidence of compression. There she found multiple hemorrhages in multiple layers of muscle tissue in both the front and back of Jessica's neck. According to Pinneri, it would have required "a directed forceful squeeze, multiple places, multiple times" to cause that level of hemorrhaging; it could not have resulted from "a light touch" or "someone simply grabbing the front of the neck."

Pinneri advised the police of her findings. Because Herrera's earlier statement was inconsistent with the extensive neck injuries seen during the autopsy, the investigators interviewed Herrera again.

Miller questioned Herrera about Jessica's neck injuries. Herrera explained that

Jessica had asked him to "choke her a little bit" during sex and that he put his right hand around her neck only "once" while he was facing her and for "no more than a few minutes." Herrera stated that, after sex, he and Jessica had an extended discussion, took photos on Snapchat, and then fell asleep. Miller had Herrera demonstrate his hand placement and the amount of pressure he had applied. At trial, Miller described Herrera as using "very mild pressure."

After the interview, Miller provided Pinneri with an audio recording of Herrera's remarks. According to Pinneri, none of Jessica's injuries were consistent with someone "simply grabbing the front of the neck" or the consensual sexual encounter Herrera described. Pinneri testified that she would not expect that someone "would be up chatting, taking photographs and talking about future plans after sustaining that degree of neck trauma." According to Pinneri, the neck injuries would likely have caused Jessica to lose consciousness.

Herrera was interviewed again. He said that Jessica had placed his hands on her neck and then he "squeezed her neck." He maintained that this was part of their consensual intercourse. During this interview, Herrera no longer indicated that they had a conversation or took pictures after the sexual encounter; instead, he said that he did not remember if she spoke at all and that he immediately passed out. Herrera told the investigators that, when he woke up the next morning, Jessica was in the same position she had been in when the intercourse ended.

After the interview, Herrera was indicted for felony aggravated assault. A jury convicted Herrera and assessed punishment at 25 years' confinement. Herrera appeals.

## Elements of the Offense

Herrera was convicted of an aggravated assault offense. The offense involves several aggravating factors that, combined, elevate it to a first-degree felony. *See* TEX. PENAL CODE § 22.01 (assault); § 22.02 (aggravated assault); § 12.32 (first-degree felony).

A person commits assault if he "intentionally, knowingly, or recklessly causes bodily injury to another." *Id.* § 22.01. The offense converts to aggravated assault if he commits assault and either "causes serious bodily injury to another" or "uses or exhibits a deadly weapon during the commission of the assault." *Id.* § 22.02. Aggravated assault elevates even more, to a first-degree felony with a punishment range of five to ninety-nine years or life, if he "uses a deadly weapon during the commission of the assault and causes serious bodily injury to a person whose relationship to or association with [him] is described by" Section 71.0021(b), which addresses "dating violence." *Id.* § 12.32, 22.02; TEX. FAM. CODE § 71.0021(b).

Section 71.0021 includes within the definition of "dating violence" any non-defensive act that is intended to result in bodily injury and is committed against one with whom the actor has or has had a "dating relationship." TEX. FAM. CODE § 71.0021(a). A "dating relationship" is "a relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature." *Id.* § 71.0021(b). The existence of a dating relationship is determined based on considerations of "(1) the length of the relationship; (2) the nature of the relationship; and (3) the frequency and type of interaction between the persons involved in the relationship." *Id.* A "casual acquaintanceship or ordinary fraternization in a . . . social context does not constitute a 'dating relationship'. . . ." *Id.* § 71.0021(c).

Both the State and Herrera agree that, as indicted, this was a result-oriented offense and, for a conviction, the jury had to determine beyond a reasonable doubt that Herrera acted intentionally or knowingly with respect to the result of his conduct, i.e., serious bodily injury.

### Assertion of Charge Error

■ In his second issue, Herrera contends that the trial court erred by incorrectly instructing the jury on the applicable mens rea for the offense. Specifically, Herrera contends that the trial court erred in instructing the jury with the conduct-oriented definition of "knowingly"—which requires that a person be aware of the nature of his conduct—in addition to the properly instructed result-oriented definition of "knowingly"—which requires that the person be aware that his conduct is reasonably certain to cause the result. He argues that this error allowed the jury to convict him by concluding only that he knowingly choked Jessica without also determining—as he contends was required—that he knowingly caused serious bodily injury.

### A. Standard of review

■ When analyzing a jury-charge issue, we first determine if error exists. *See Almanza v. State*, 686 S.W.2d 157, 174 (Tex. Crim. App. 1985) (en banc) (op. on reh'g); *Tottenham v. State*, 285 S.W.3d 19, 30 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). If there is error, we then consider whether an objection to the charge was made to preserve error because whether error was preserved determines the appropriate harm analysis to apply. *Tottenham*, 285 S.W.3d at 30. When charge error is not preserved, the error may lead to reversal only if it created egregious harm, meaning that the error was so harmful that the defendant did not

have a fair and impartial trial. *Almanza*, 686 S.W.2d at 171. When considering whether a defendant suffered egregious harm, a reviewing court must consider: (1) the entire jury charge; (2) the state of the evidence, including the contested issues and weight of probative evidence; (3) the argument of counsel; and (4) any other relevant information revealed by the record of the trial as a whole. *Id.* at 171. The reviewing court examines the whole record for "actual, not just theoretical, harm to the accused." *Id.* at 174.

The State concedes that the trial court should not have instructed the jury with the conduct-oriented definition of "knowingly." Herrera, in turn, concedes that he did not object to the error. Thus, we will review the record for egregious harm.

### B. Assuming error, Herrera did not suffer egregious harm to warrant reversal

■ An erroneous instruction is egregiously harmful if it denies a defendant a fair and impartial trial in that it goes to the very basis of the case, deprives the defendant of a valuable right, or vitally affects his defensive theory. *Almanza*, 686 S.W.2d at 172. We consider the entire jury charge, the state of the evidence, counsels' argument, and any other relevant information in the trial record as a whole when reviewing for egregious harm. *Id.* at 171.

#### 1. Jury charge

The court's charge contained the following definition of "knowingly":

A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware

that his conduct is reasonably certain to cause the result.

Thus, the jury was instructed on both the conduct-oriented and the result-oriented definitions of "knowingly."

■ Definitions in a charge must be examined in the context in which the defined terms appear and not in isolation. *Turner v. State*, 805 S.W.2d 423, 430–31 (Tex. Crim. App. 1991) (en banc). In the application paragraph, the charge instructed the jury to convict Herrera only if it found beyond a reasonable doubt that Herrera "knowingly cause[d] serious bodily injury to" Jessica and to acquit Herrera if it had reasonable doubt or did not so find. As such, there is little risk that the jury interpreted the charge as instructing it to convict based solely on a finding that Herrera intended to use his hands to choke Jessica without consideration of the result of that action. The charge made clear that the jury could not convict unless it found beyond a reasonable doubt that he "knowingly cause[d] serious bodily injury." Thus, Herrera has not established egregious harm. *See Peterson v. State*, 836 S.W.2d 760, 765–66 (Tex. App.—El Paso 1992, pet. ref'd) (concluding that no harm was shown from inclusion of both conduct-oriented and result-oriented definitions of "knowingly" because application instruction properly required jury to find beyond reasonable doubt that defendant knowingly caused bodily injury); *see also Almanza*, 686 S.W.2d at 172.

Moreover, the charge included a mistake-of-fact instruction, which informed the jury that, even if it found that Herrera knowingly caused serious bodily injury to Jessica, if it also found that Herrera formed a reasonable belief of fact by mistake that negated the culpability required to find him guilty, then the jury must find Herrera not guilty. This instruction further mitigates the risk that the jury could

have understood the charge to allow a conviction based on a finding that Herrera only intended to choke Jessica without also intending to cause her serious bodily injury. This can be seen in Herrera's closing argument.

### 2. Closing arguments

During his closing argument, Herrera's counsel discussed the mistake-of-fact instruction. He told the jury that if Herrera had a mistake of fact that caused him to form a reasonable belief "that he was not causing any injury or he was doing it, let's say, consensually," then the jury was obligated to find him not guilty. In other words, Herrera argued to the jury that it could not convict if it doubted that he intentionally or knowingly caused serious bodily injury.

The inclusion of this argument that linked the mistake-of-fact instruction to whether Herrera intended to cause serious bodily injury further demonstrates the lack of egregious harm in instructing the jury on both "knowingly" definitions. There is little risk that a reasonable jury would have determined from the charge, in light of the closing argument, that it could have convicted simply based on a finding that Herrera intended to engage in the act of choking.

### 3. Evidence

In the police interviews admitted into evidence, Herrera did not deny that he choked Jessica or deny remembering having done so. Instead, he admitted that he "choked" her, described the event as consensual, and explained in detail how he used only his right hand for only a few seconds without applying force. But Jessica's neck injuries revealed in the autopsy were irreconcilable with Herrera's description.

Dr. Pinneri, the assistant deputy chief medical examiner, testified that Jessica

had significant neck injuries that could have resulted only from intense squeezing in multiple places at multiple times. She described "large," "pronounced" hemorrhages in Jessica's neck that went "down into multiple layers" of muscle in both the front and the back of her neck. The hemorrhaging caused "substantial" accumulations of blood, which, according to Pinneri, could only result from "direct significant force" and not merely from "just a light touch or something like that." She elaborated: "It's going to have to be a directed, forceful squeeze, multiple places, multiple times ... to achieve the hemorrhages" found in Jessica's autopsy. To achieve these injuries, it would have required pressing hard enough "to actually cause the blood vessels to burst," which would have required "a significant amount of pressure or force." Along with the hemorrhages and contusions, Pinneri found evidence of petechial hemorrhaging (i.e., ruptured blood vessels) near Jessica's eyes.[2]

Dr. Pinneri testified that Jessica's injuries were not consistent with Herrera's earlier statements describing how he claimed to have placed his hands on Jessica's neck. There were "too many hemorrhages in too many locations and they're too deep to be ... as [he] demonstrated and described." Herrera had to have used a significant amount of force at the front and back of Jessica's neck—enough to damage multiple layers of muscle, burst blood vessels, cause significant pooling of blood in the neck, restrict blood flow to the brain so as to cause additional petechial hemorrhaging, and, ultimately, to cause a

loss of consciousness. The jury was shown autopsy photographs evidencing Jessica's neck injuries.

Pinneri's testimony and the autopsy photographs could have led a reasonable jury to conclude that Herrera was untruthful in his explanation of events and that, instead, he used significant force against Jessica.

Furthermore, according to Pinneri, the extent of Jessica's neck injuries make it unlikely that, after intercourse, she had been lying comfortably with Herrera, casually discussing their evening and future plans, as Herrera had claimed in one of his police interviews. Instead, according to Pinneri, once Jessica received those neck injuries, she likely would have lost consciousness.

The evidence of significant physical trauma to Jessica's neck belies Herrera's assertion of egregious harm from charge error because the evidence leaves little risk that a reasonable jury could have concluded that Herrera knew he was "choking" Jessica but was not aware that his conduct was reasonably certain to cause serious bodily injury.

We conclude that Herrera has not demonstrated egregious harm in the submission of both "knowingly" definitions in the court's charge. We overrule his second issue.

### Sufficiency of the Evidence

In issues one, three, and four, Herrera challenges the sufficiency of the evidence on various elements of the offense for

2. Pinneri noted that petechial hemorrhaging is typically not seen in a "sedative-type overdose death," but, instead, with compression or strangulation based injuries involving "an absence or reduction of blood flow that goes to the brain." The discussion of sedative-related death and overdose arose in light of Jessica's toxicology results. Pinneri testified that the level of Hydrocodone in Jessica's body would not typically cause death on its own. The level of alcohol in her body, though, was "just starting into a lethal range."

which he was convicted. Specifically, he argues that there was insufficient evidence that he "choked" Jessica, that he did so "intentionally and knowingly," and that he and Jessica were in a "dating relationship" as was required to elevate the offense to a first-degree felony.

## A. Standard of review

We review sufficiency of the evidence using the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979). *See Brooks v. State*, 323 S.W.3d 893, 898–902 (Tex. Crim. App. 2010). Under that standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis omitted); *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). We consider all reasonable inferences that may be drawn from the evidence in making our determination, including all direct and circumstantial evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

█ Evidence is insufficient in four circumstances: (1) no evidence exists that is probative of an element of the offense in the record; (2) only a "modicum" of evidence exists that is probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt; and (4) the alleged acts do not establish the criminal offense charged. *See Jackson*, 443 U.S. at 314, 320, 99 S.Ct. at 2786, 2789; *Laster*, 275 S.W.3d at 518.

The jury has the exclusive role of evaluating the facts, the credibility of the witnesses, and the weight a witness's testimony should be given. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. [Panel Op.] 1981); *Jaggers v. State*, 125 S.W.3d 661, 672 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). The jury may choose to believe all, some, or none of a witness's testimony. *Davis v. State*, 177 S.W.3d 355, 358 (Tex. App.—Houston [1st Dist.] 2005, no pet.). And the jury alone must reconcile any conflicts in the evidence. *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000).

Under the *Jackson* standard, we defer to the factfinder "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Clayton*, 235 S.W.3d at 778. If there are conflicts in the evidence, we must presume the factfinder resolved the conflicts in favor of the verdict and defer to that determination, as long as it is rational. *See Jackson*, 443 U.S. at 326, 99 S.Ct. at 2793; *Penagraph*, 623 S.W.2d at 343 ("A jury is entitled to accept one version of the facts and reject another or reject any of a witness'[s] testimony."). Contradictory evidence will not diminish the legal sufficiency of the evidence that supports the verdict. *See McDonald v. State*, 462 S.W.2d 40, 41 (Tex. Crim. App. 1970). If the evidence is insufficient, we must reverse and enter an order of acquittal. *See Tibbs v. Florida*, 457 U.S. 31, 41, 102 S.Ct. 2211, 2218, 72 L.Ed.2d 652 (1982).

## B. Evidence of "choking"

█ Herrera was indicted for and convicted of the offense of aggravated assault by causing serious bodily injury to Jessica "by choking [her] with his hands." In his videotaped interview, Herrera described how he "squeezed" Jessica's neck as he was "choking" her. Dr. Pinneri testified about extensive hemorrhaging and contusions on Jessica's neck consistent with significant compression of the neck. Thus, there is legally sufficient evidence from

which a reasonable jury could have concluded that Herrera did as he admitted—squeezed Jessica's neck and choked her—and, in doing so, caused bodily injury.

Herrera's argument, though, is not that the evidence is insufficient to conclude that he did what he admitted he had done. Instead, his argument is that (1) the indictment specifically alleged that he injured Jessica by "choking" her; (2) the term "choking" signifies a restriction of *air* flow; (3) Dr. Pinneri testified that Herrera restricted Jessica's *blood* flow to the brain; and, thus, (4) there was legally insufficient evidence that he did what the indictment alleged: choked Jessica.

The combination of Herrera's statements and Dr. Pinneri's testimony provided legally sufficient evidence for the jury to conclude that Herrera caused bodily injury by choking Jessica. Herrera admitted that, in his words, he "choked" Jessica and "squeezed" her neck. He demonstrated doing so in the video played for the jury. And Pinneri testified that she found evidence that there had been "a significant amount of pressure" placed on Jessica's neck that caused extensive bodily injury. She explained that her testimony about neck compression was consistent with what lay people commonly refer to as "choking." She also confirmed that Herrera's physical demonstration of applying pressure on Jessica's neck and his use of the term "choking" to describe that act were consistent with the bodily injuries Pinneri observed on Jessica's neck. Moreover, according to Pinneri, Herrera's action would "decrease the amount of blood that the brain is receiving" as well as "deprive the brain potentially of receiving oxygen."

We conclude that there was legally sufficient evidence, including Herrera's own statement, from which the jury reasonably could have concluded, beyond a reasonable doubt, that Herrera choked Jessica and

caused bodily injury. *Cf. Cordero v. State*, No. 04-95-00713-CR, 1997 WL 13608, at *4 (Tex. App.—San Antonio 1997, pet. ref'd) (mem. op., not designated for publication) (rejecting defendant's argument that there was no evidence that he had "choked" complainant because medical examiner testified that complainant died only from restricted blood flow, not from restricted air flow; rejecting argument, in part, based on medical examiner's testimony that colloquial term "choking" includes strangulation, which blocks both air and blood).

We overrule Herrera's third issue.

## C. Evidence of mens rea

■ In his first issue, Herrera argues that nothing in Herrera's statements to police "suggests he had any intent to harm or seriously hurt" Jessica. Instead, he asserts that he squeezed her neck because she asked him to do so during their sexual encounter. He asserts that Dr. Pinneri's testimony "offered no insight into whether someone causing [Jessica]'s injury would have necessarily been aware of the danger involved."

■ Direct evidence of the requisite culpable mental state—the mens rea of the offense—is not required. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). Mens rea is almost always proven through circumstantial evidence. *Stobaugh v. State*, 421 S.W.3d 787, 862 (Tex. App.—Fort Worth 2014, pet. ref'd); *see Tottenham*, 285 S.W.3d at 28 ("[B]oth intent and knowledge may be inferred from circumstantial evidence and proof of a culpable mental state almost invariably depends on circumstantial evidence."). "A jury may infer intent from the acts, words, and conduct of the accused, as well as from the extent of the injuries and the relative size and strength of the parties." *In re I.L.*, 389 S.W.3d 445, 456 (Tex. App.—El Paso 2012,

no pet.). Additionally, a jury may infer that a criminal defendant intended the natural consequences of his acts. *See Ruffin v. State,* 270 S.W.3d 586, 591–92 (Tex. Crim. App. 2008).

There is ample circumstantial evidence from which a reasonable jury could have concluded that Herrera had the requisite mens rea to find him guilty of aggravated assault, meaning that he was aware that his conduct was reasonably certain to cause serious bodily injury. Herrera admitted that he squeezed Jessica's neck, but his various statements to police were not consistent with each other or with the physical evidence of Jessica's injuries. Initially, he omitted the choking incident from his description of events. At another time, he admitted that he choked her but said that it was with only one hand. At another time, he said that she placed both of his hands on her neck. These inconsistencies in Herrera's statements could have led a reasonable jury to conclude that he was not credible and to disregard his statements that sought to diminish his role in Jessica's injuries. *See Revels v. State,* 334 S.W.3d 46, 53 (Tex. App.—Dallas 2008, no pet.) (stating that jury could believe portions of individual's testimony that supported conviction while disregarding other inconsistent portions of testimony).

Dr. Pinneri testified that Herrera's descriptions of how he squeezed Jessica's neck were inconsistent with the injuries revealed in the autopsy. It would have required a significant amount of force on Jessica's neck to cause the depth and severity of her injuries, including significant hemorrhaging deep within the layers of muscle in her neck. Because all evidence indicated that Herrera was the only person in the hotel room with Jessica when her neck was injured and those injuries could not have been caused by the minimal degree of force Herrera claimed he applied,

the jury could have concluded that he was being untruthful in his explanations and, based on that conclusion, inferred that he had the requisite culpable mental state when he inflicted such serious injuries to Jessica's neck. *See Padilla v. State,* 326 S.W.3d 195, 201 (Tex. Crim. App. 2010) (rational factfinder may consider defendant's untruthful statements, in connection with other circumstances of case, as affirmative evidence of defendant's guilt).

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have reasonably inferred from Herrera's acts, conduct, and remarks and from the surrounding circumstances that he possessed the requisite culpable mental state to support a conviction for aggravated assault.

We overrule Herrera's first issue.

### D. Evidence of dating relationship

In his fourth and final issue, Herrera contends that the evidence is legally insufficient to prove that he and Jessica were in a dating relationship, as was required to elevate the aggravated-assault offense to a first-degree felony. *See* Tex. Penal Code § 22.02; Tex. Fam. Code § 71.0021.

The "dating violence" provision lists factors to be considered in evaluating whether a relationship meets its definition, while noting that a "casual acquaintanceship" will not qualify. Tex. Fam. Code § 71.0021(b)–(c). "The existence of a relationship shall be determined based on consideration of: (1) the length of the relationship; (2) the nature of the relationship; and (3) the frequency and type of interaction between the persons involved in the relationship." *Id.* § 71.0021(b).

In Herrera's videotaped statements to the police, he told the investigating officer that he had asked Jessica to be his girl-

friend and had given her a ring on the night of prom. The two had sexual intercourse and, in Herrera's words, "talked about our future." Sergeant Miller referred to Jessica as Herrera's girlfriend, and Herrera did not correct that characterization. Herrera told Miller that he and Jessica had been dating for three weeks at the time of her death. In a portion of the police-interview video, Herrera's mother is in the interview room with Herrera and says, "You loved her, right?" to which he responded by nodding affirmatively.

The jury determined that a teenage romance that had progressed in this manner, with these types of interactions, and had continued for three weeks leading up to Jessica's death, constituted a "continuing relationship of a romantic or intimate nature." *Id.* (defining "dating relationship" as "a relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature.").

Herrera argues that a three-week relationship is inadequate to meet the statutory definition of a "dating relationship." He points to a one-month relationship at issue in *Villarreal v. State*, 286 S.W.3d 321 (Tex. Crim. App. 2009), arguing that three weeks does not meet that threshold and that there are no other cases approving of a dating period of less than one month as qualifying as a "continuing relationship" under the statute. But the appellate issues in *Villarreal* did not involve whether the length of the relationship met the statutory standard. And at least one other "dating violence" case involving teenagers dealt with a couple who had been "dating" only two weeks and considered each other as boyfriend and girlfriend. *See B.C. v. Rhodes*, 116 S.W.3d 878, 880 (Tex. App.—Austin 2003, no pet.) (as with *Villarreal*, not involving challenge to whether length of relationship was statutorily adequate).

Because a rational trier of fact could have concluded, on this evidence viewed in the light favorable to the verdict, that Herrera and Jessica were in a dating relationship, we overrule Herrera's fourth and last issue.

### Conclusion

We affirm.