

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-17-00227-CR

_____


LARRY ANTONE CADWELL, Appellant

V.

THE STATE OF TEXAS, Appellee


On Appeal from the County Court at Law
Rusk County, Texas
Trial Court No. 16-11-0782CR


Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Chief Justice Morriss

# O P I N I O N

While Larry Antone Cadwell—who goes by the name Tony and who will be so referenced in this opinion—and his estranged wife, Cheryl Cadwell, were involved in divorce proceedings, various horses belonging to them but having been ordered into Tony's custody lost weight, reportedly due to inadequate nutrition, according to Cheryl and other witnesses. This was particularly true of Diamond, an older horse that customarily had been ridden by Cheryl. This resulted in Tony's conviction for cruelty to livestock animals[1] and a sentence of 180 days in jail, a sentence which was probated to twenty-four months on condition that Tony serve thirty days in jail.

On appeal, Tony argues the legal and factual[2] insufficiency of the evidence to support the element of intentional or knowing mens rea. He also asserts, as part of his legal-sufficiency challenge—making it a multifarious[3] point of error—that including the phrase "by neglect" in the information and in the jury charge improperly lowered the mens rea requirement.

---

[1]*See* TEX. PENAL CODE ANN. § 42.09(a) (West 2006).

[2]Since 2010, there has not been a factual-sufficiency review of the evidence to support a conviction. *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). Because we are not permitted to review the factual sufficiency of the evidence to support a conviction, we will confine our sufficiency analysis to the legal sufficiency of the evidence.

[3]We could overrule the point of error entirely or at least ignore the "by neglect" argument, because it is multifarious. *See, e.g.*, *Dickey v. State*, 189 S.W.3d 339, 341 (Tex. App.—Texarkana 2006, no pet.); *Newby v. State*, 169 S.W.3d 413, 414 (Tex. App.—Texarkana 2005, pet. ref'd); *Harris v. State*, 133 S.W.3d 760, 764 n.3 (Tex. App.—Texarkana 2004, pet. ref'd); *Parra v. State*, 935 S.W.2d 862, 875 (Tex. App.—Texarkana 1996, pet. ref'd). However, in the interest of justice, we will address those specific complaints raised by Tony.

Because (1) legally sufficient evidence supports Tony's conviction and (2) the use of the phrase "by neglect" did not improperly reduce the State's burden to prove Tony's willful or knowing mens rea, we affirm the trial court's judgment.

*(1)* *Legally Sufficient Evidence Supports Tony's Conviction*

In evaluating legal sufficiency of the evidence, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks*, 323 S.W.3d at 912 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). We examine legal sufficiency under the direction of the *Brooks* opinion, while deferring to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Further, the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony and may "believe all of a witnesses' testimony, portions of it, or none of it." *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014).

In our review, we consider "events occurring before, during[,] and after the commission of the offense and may rely on actions of the defendant [that] show an understanding and common design to do the prohibited act." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985)). It is not required that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative

3

force of all the incriminating circumstances is sufficient to support the conviction." *Id.* Circumstantial evidence and direct evidence can be equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone. *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13 (citing *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004)).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The "hypothetically correct" jury charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

Under the relevant statute and the information, to obtain a conviction for cruelty to livestock animals, the State had to prove beyond a reasonable doubt that Tony (1) intentionally or knowingly (2) failed unreasonably to provide (3) food, water, or care (4) for one or more livestock animals (5) in Tony's custody, where (6) Tony's

> conduct was not a generally accepted and otherwise lawful form of conduct occurring solely for the purpose of or in support of fishing, hunting, or trapping; or wildlife or depredation control, or shooting preserve practices as regulated by state and federal law; or animal husbandry or agriculture practice involving livestock animals.

*See* TEX. PENAL CODE ANN. § 42.09(a)(2), (f) (West 2016) (cruelty to livestock animals and exception to offense), § 2.02 (West 2001) (negating exception to offense as element of offense).

4

Tony challenges the sufficiency of the evidence only as it relates to the intentional or knowing mens rea component of the State's proof.

Direct evidence of the required mens rea for an offense is not necessary. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002); *Herrera v. State*, 526 S.W.3d 800, 809–10 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd). Seldom is mens rea proven through direct evidence. *Herrera*, 526 S.W.3d at 809; *Stobaugh v. State*, 421 S.W.3d 787, 862 (Tex. App.—Fort Worth 2014, pet. ref'd). The fact-finder is allowed to conclude that an actor intends the natural consequences of his or her acts. *Ruffin v. State*, 270 S.W.3d 586, 591–92 (Tex. Crim. App. 2008); *Herrera*, 528 S.W.3d at 810.

We now set forth a sampling of evidence in this record tending to support a finding that Tony was intentional or knowing when he failed unreasonably to provide food, water, or care for a livestock animal.

Cheryl testified that she owned and rode Diamond for about ten years and that she loved her horses. Cheryl moved out of the marital residence and filed for divorce from Tony in 2016, before the events related to the horses detailed below. A court order left Tony in custody of various items belonging to the couple, including the twenty-three horses involved here. After a conflict over Tony's obligation to pay Cheryl approximately $5,000.00 from a tax refund, Cheryl noticed that Tony was not feeding the horses as much and had changed the ignition in the tractor so Cheryl could not use the tractor to feed the horses anymore by moving bales of hay into the horses' enclosure. At one point, the trial court overseeing the domestic relations case appointed a Larry Galyean to sell the horses, but Tony would not cooperate with him. All the horses started losing

5

weight because, Tony was not feeding the horses.[4] At times Cheryl would let the horses into a different enclosure, a "hay trap" that had grass and hay, so they could eat, but Tony moved them out of that enclosure and back into an area that had little or no food. During Cheryl's periodic visits to the property where the horses were kept, she never saw hay in the horses' enclosure. Also during her visits, she marked the tractor's tires with chalk and thereby determined, that, between her visits, the tractor had not been moved. Cheryl's horse Diamond became malnourished, and his hooves became cracked and split badly due to malnutrition. Cheryl believed that Diamond was being "starved to death" during Tony's custody. But, with proper feeding and care after the seizure, he has recovered and is now doing well.

Jamie Yoakum, an investigator with the Rusk County Sheriff's Office, testified that his involvement with this case began when Tony filed a complaint around the middle of October 2016 about the alleged theft of two of the twenty-three horses, thinking that Cheryl had stolen the horses. When Yoakum reached the property, he noticed that the natural vegetation in the enclosure in which the horses were kept was very scarce and that most of the horses were thin, but "nothing like" Diamond. Generally, the horses were thin or in less than ideal condition. As a result, the theft investigation turned into an animal cruelty investigation. When Tony was interviewed about the poor condition of many of the horses, he offered the explanation that the horses had been let into another enclosure where they ate some goat weed, resulting in them having scours, a severe diarrhea. Yoakum did not find any evidence of the horses having had diarrhea, though. As a result

___

[4]Cheryl observed that the enclosure in which the horses were kept did not allow them access to the hay in the other enclosure.

of the horses' poor condition, they were seized. Yoakum felt that Tony was not feeding the horses enough. Yoakum has never seen an animal get as bad as Diamond within a month or two, if the problem had been eating some grass with herbicide, for example.

Alishia Bammel was the animal control deputy and animal cruelty investigator for the Rusk County Sheriff's Office. Though she had been in law enforcement for many years before, she obtained training for, and has been in her current specialty in, animal control and animal cruelty for the four years before trial. Bammel accompanied Yoakum to the property where the horses were located, for the initial purpose of investigating the theft complaint. In the first enclosure they approached, there were no horses, but it was overgrown with weeds and grass, and within it was a tractor and older hay that had grass growing up around it, revealing lack of recent activity. As they approached a second enclosure, they encountered a large number of horses in that enclosure that "were in very, very poor condition" with "a lot of ribs . . . [and] hipbones showing." Some of the horses were in "okay" condition, but one was in very bad condition with a body score of two. Brammel then noticed that the enclosure in which the horses were contained was "not adequate at all" for the animals that were kept there. The horses did not have access to the first enclosure that had hay in it. Their enclosure had "virtually no grass," and the grass that was present was "too short for them to eat." All the bushes and small shrubs had been picked clean, a phenomenon that happens when animals with access to such vegetation are underfed and desperate for food. The troughs within that enclosure were empty, had only leaves and debris, or had been overturned. A stock tank or pond had water, but it was filled with debris and was stagnant. There was no evidence of hay found in the horses' enclosure. The officers determined to seize the horses promptly and

7

proceeded to arrange to do so the next day.[5]  Within a week or two after the seizure, with just proper feeding and de-worming, Diamond was showing improvement.  Diamond had had parasites, but not as many as some of the other horses.

The last State's witness was Lori Cavitt, a veterinarian with Henderson Animal Care Hospital.  Cavitt had been a veterinarian for eleven years after her training consisting of a college bachelor's degree and a four-year veterinary degree from Texas A&M University.  Cavitt explained the body scoring scale of from one (extremely emaciated) to nine or ten (being extremely obese).  An acceptable range for a horse is four to six.  A horse that is scored under four is in a condition that needs to be addressed.  A horse scored at three on this scale is considered thin, while a score of two would indicate a horse that is emaciated but standing, and a one would indicate extreme emaciation, not able to stand, and not considered savable.  When Cavitt saw the Cadwell horses, the majority were thin.  The horses were examined one by one, estimating their ages, assessing the body condition score, and taking a fecal sample of each to measure the degree to which each had parasites.  Given the body condition of the horses, she was surprised with the relatively low parasite presence in most of them.  Based on her examination, she concluded that the most likely reason for the horses' thinness was that they were not being fed properly.  If a horse has the choice of grass, hay, and goat weed, it will usually eat grass first, then hay, and finally goat weed if it is hungry.

_____

[5]This was true, even though fourteen of the twenty-three horses were considered to be in "good condition."

8

From the above, a rational jury could have found beyond a reasonable doubt that Tony was intentional or knowing in not providing one or more of the horses in his care enough nutrition. We overrule this contention.

*(2)    The Use of the Phrase "By Neglect" Did Not Improperly Reduce the State's Burden to Prove Tony's Willful or Knowing Mens Rea*

Tony argues that, by inserting "by neglect" in the information and the jury charge, the State and the trial court, respectively, improperly instructed the jury and improperly lowered the mens rea requirement from intentionally or knowingly to a lower mens rea. The State argues that the phrase "by neglect" is merely the manner or means by which the offense was committed. Neither party cites any authority near the heart of either argument.

The State's position on this point has support, notably from the scholarly Cathy Cochran, former Judge of the Texas Court of Criminal Appeals: "Generally, adverbial phrases, introduced by the preposition 'by,' describe the manner and means of committing the offense. They are not the gravamen of the offense, nor elements on which the jury must be unanimous." *Jefferson v. State*, 189 S.W.3d 305, 316 (Tex. Crim. App. 2006) (Cochran, J., concurring). We agree that, here, the phrase "by neglect" charges Tony with cruelty to animals by the manner and means of failure to act or of behavior that was not attentive to the needs of the horses, not with negligently doing so, especially given that the mens rea was specified in both the information and in the jury charge as intentional or knowing.

Here, the information charged in this language:

On or about the 17th day of October, 2016, in the County of Rusk and State of Texas, one LARRY ANTONE CADWELL did then and there intentionally and

9

knowingly fail unreasonably to provide necessary food for livestock animals, to-wit horses, in the defendant's custody, by neglect, . . . .

At trial, the trial court charged the jury as follows:

1.

A person commits an offense if he intentionally or knowingly fails unreasonably to provide necessary food for a livestock animal in the person's custody.

2.

. . . . "Necessary food" includes food provided to the extent required to maintain the livestock animal in a state of good health.

A person acts intentionally, or with intent, with respect to the nature of his conduct or a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly or with knowledge with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

3.

Now, if you find from the evidence beyond a reasonable doubt that on or about 17th day of October, 2016, in Rusk County, Texas, the defendant, Larry Antone Cadwell, did intentionally or knowingly fail unreasonably to provide necessary food for livestock animals, to-wit horses, in the defendant's custody, by neglect, . . . then you will find the defendant guilty of the offense of cruelty to livestock animals as charged in the information.

In each place, Tony was accused of intentional or knowing conduct; and, after the other elements of the offense were set out, the words "by neglect" were added. We conclude that those two words charged the manner and means in which Tony was alleged to have committed the offense, consistent with the above observations by former Judge Cochran.

10

Further supporting that conclusion, and further undermining Tony's argument that the threshold for finding a guilty mens rea was lower than was proper, are the understandings in analogous situations that the word "neglect" connotes a failure to act in fulfilling an obligation to care for another. In a brief survey, we have found a few such analogous situations, in all of which such is the meaning of "neglect." Where there is a duty to care for children, patients, or aged persons, "neglect" connotes simply a lack of necessary action by the one responsible for the care, not negligent behavior by that responsible person. *See, e.g.*, 42 U.S.C.A. § 1397j(16) (West, Westlaw through P.L. 115-173 Jun. 12, 2018) ("neglect" of elder person); TEX. FAM. CODE ANN. § 261.001(4)(A) (West Supp. 2017) ("neglect" of children); TEX. HEALTH & SAFETY CODE ANN. § 260A.001(6) (West 2017) ("neglect" of residents of certain health facilities). In a case in which a caregiver could have been considered negligent in actions toward a geriatric patient placed in a chair, from which the patient fell, the appellate court ruled that the caregiver could not have been guilty of neglect. *See Gonzales v. Methodist Ret. Cmtys.*, 33 S.W.3d 882, 885 (Tex. App.—Houston [14th Dist.] 2000, pet. denied); *see also* TEX. FAM. CODE ANN. § 261.001(4)(A)(ii)(c) ("neglect" of child includes failure to provide child with food); *In re E.C.R.*, 402 S.W.3d 239, 240 (Tex. 2013) (termination of parental rights based on abuse or neglect, not involving negligence); *Cates v. State*, 776 S.W.2d 170, 174–80 (Tex. Crim. App. 1989) (Teague, J., concurring) (reporting neglect); *In re A.A.A.*, 265 S.W.3d 507, 516 (Tex. App—Houston [1st Dist.] 2008, pet. denied) (removal of child based on neglect, not involving negligence).

Because the use of the phrase "by neglect" set out the manner and means of committing the offense and because the information and jury charge clearly set out the required mens rea of

11

intentional or knowing behavior by Tony, the use of the phrase did not improperly reduce the State's burden to prove Tony's willful or knowing mens rea. We overrule this contention.

We affirm the judgment of the trial court.


Josh R. Morriss, III
Chief Justice


Date Submitted:    June 13, 2018
Date Decided:     June 21, 2018

Publish

12