Opinion issued August 19, 2025



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-23-00741-CR

———————————

**COREY ALLEN TRUMBULL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 30th District Court**
**Wichita County, Texas**
**Trial Court Case No. DC30-CR2023-0666-1**

---

## MEMORANDUM OPINION

The appellant was convicted of capital murder for intentionally causing the death of a child between the ages of ten and fifteen. The trial court assessed punishment at confinement for life with no possibility of parole. *See* TEX. CODE

CRIM. PROC. art 37.071, § 1. In a single point of error, the appellant claims the evidence was legally insufficient to support his conviction.[1] We affirm.

**Background**

When Stormy Johnson met the appellant, the lives of Stormy's two children would soon get much worse. Over the course of a few months, fourteen-year-old Lacy was forced to watch as the appellant subjected her brother, eleven-year-old Luke, to increasingly abusive treatment that culminated in Luke's death.[2]

Stormy met the appellant in 2019, and soon moved herself and the children into a Midland motel with the appellant in mid-July. Stormy's mother, Dorothy, was concerned about the situation and called CPS, which apparently prompted Stormy and the appellant to move to another motel in Midland, and soon after that hundreds of miles away to Chilicothe. Dorothy lost contact with them, except for once in September when Stormy and the appellant came to her house to get furniture. They did not let Dorothy see her grandchildren on that occasion.

---

[1]  The Texas Supreme Court transferred this case to this Court from the Court of Appeals for the Second District as part of a docket equalization order. *See* TEX. GOV'T CODE § 73.001. We must apply the precedent of the transferor court "if the transferee court's decision otherwise would have been inconsistent with the precedent of the transferor court." TEX. R. APP. P. 41.3. The parties have not argued there is any relevant area of law where our precedent varies from the Second Court's, nor are we aware of any.

[2]  We use pseudonyms for the child victims.

The appellant, Stormy, and the children stayed at a trailer in Chilicothe for some time before getting evicted and moving to a Red Roof Inn in Wichita Falls on October 2. The evidence at trial of what occurred in the Chillicothe trailer and the Wichita Falls hotel room came from Lacy's testimony and from forensic examination of Luke's body.

Lacy testified the appellant treated Luke in increasingly abusive ways. In the Chillicothe trailer, the appellant forced Luke to stay in a room covered with dog urine and feces and full of dirty clothes. There was no mattress in the room; Luke slept on a makeshift pallet of dirty clothes. The appellant and Stormy would make fun of Luke for this. When Luke came out of the room the appellant—who weighed approximately 220 pounds—would become aggressive and sometimes strike or kick Luke. The appellant also controlled when Luke ate. He did not let Luke eat every day, and he would threaten to cut off Luke's fingers if he caught Luke trying to sneak food.

The appellant had three dogs, one male and two female. After the move to the Wichita Falls hotel room, the appellant began calling Luke "Bitch Boy," telling him he was subservient to the male dog. The appellant allowed the dogs to sleep on one of the two beds in the room but made Luke sleep on the floor under the sink. The appellant and Stormy fed Luke dog food and forced him to drink from the dog bowls. They would not allow Luke to use the restroom so that he was forced to urinate on

himself. Lacy testified the appellant also would "cut [Luke's] urethra" so it was painful to urinate.

Lacy testified the appellant regularly assaulted Luke in both Chillicothe and Wichita Falls. The appellant would strike Luke with his fist while wearing a large skull ring. The appellant also had a stick he had sanded down and reinforced with epoxy and tape that he used to beat Luke.[3] Lacy testified that Stormy sometimes participated in the beatings and cheered the appellant on.

The appellant's most traumatic attack on Luke occurred sometime in December. The appellant got angry with Luke for making noises and kicked him into the wall. Luke, who was bleeding and crying, retreated by lying down under the sink. The appellant then stomped on Luke's head. Luke went unconscious; the appellant and Stormy laughed and walked away from Luke.

Lacy testified that when Luke regained consciousness the next day he acted differently, "almost like a high special needs child." He had developed a lazy eye and "couldn't really walk or talk." Lacy said it was obvious to her Luke needed medical attention but the appellant told her not to call 911 because that if she did they would go to jail.

---

[3]  In an interview with police, the appellant called this the "Gotta Beat a Bitch" stick. The appellant claimed Luke, an eleven-year-old boy, was a masochist and liked being hit with this stick.

Lacy estimated Luke was in this condition for about two weeks, but she also said her notion of time may have been distorted because the appellant was giving her methamphetamine. Lacy testified that the only medical treatment Luke received during this period was a butterfly bandage the appellant put on a gash on Luke's head.

After Luke sustained these injuries, the appellant promised Luke he would never hit him again. Yet the abuse continued: both the appellant and Stormy continued to punch Luke and beat him with a belt that had a metal buckle.

Lacy testified that while Luke lingered in this condition the appellant and Stormy did not give him any food. Eventually Stormy prepared some chicken noodle soup for Luke and propped him up on a bed. She tried to feed him the soup, but Luke began coughing up blood then lost consciousness. The appellant tried unsuccessfully to give Luke CPR, but no one called 911.

Lacy testified that the appellant checked Luke for a pulse and realized he was dead. The appellant covered Luke's body with a sheet and later moved Luke's body to the bathtub. The appellant and Stormy went to the convenience store and returned with three large bags of ice and a bottle of bleach. They dumped the ice on Luke's body to slow decomposition, and they forced Lacy to clean up Luke's blood from around the sink with the bleach.

Lacy testified that Luke's body stayed in the bathtub for about three days as the appellant and Stormy sought a location to dump it. Eventually Stormy removed the bloody clothes from Luke's body, dressed the body with clean clothes, and put it in a wheelchair. The appellant and Stormy rolled Luke's body out of the hotel room in the middle of the night and left Lacy by herself. When the appellant and Stormy returned, without Luke's body, they were "[p]roud" and acted "like they just came back from having, like, a night out." Lacy testified they were laughing. Lacy testified that after disposing of Luke's body the appellant and Stormy did some drugs and watched Futurama, an animated sitcom, on the television.

On December 27, the appellant, Stormy, and Lacy got evicted from the Wichita Falls hotel room. They drove to Las Vegas, Nevada. In February 2020, Stormy was in the hospital and Detective Metzger from the Las Vegas police department spoke with her about an unrelated matter. During that meeting Stormy called her mother, Dorothy, who asked to speak to Detective Metzger. Dorothy asked Detective Metzger how Lacy and Luke were. Detective Metzger was aware of Lacy but did not know who Luke was. When Detective Metzger asked Stormy how Luke was, Stormy began to cry and "wail in pain." Stormy told Detective Metzger that Luke had died in Texas. Detective Metzger forwarded the information she had to the Wichita Falls Police Department.

Wichita Falls police officers found Luke's body on February 27. It was in the backseat of a car parked behind an abandoned house half a block from the Red Roof Inn. The body was buried under a pile of clothes and was entering a state of mummification.

Dr. Suzanne Dakil, a physician certified in child abuse pediatrics, described Luke's body as that of "a battered, emaciated child." Dr. Dakil described injuries all over Luke's body—he showed signs of being beaten with a stick on his buttocks, his back, and his front. Dr. Dakil described injuries to Luke's buttocks as "confluent," meaning there were so many bruises she could not tell individual bruises apart. Dr. Dakil said Luke would not have been able to sit down without pain. Dr. Dakil said the injuries to Luke's face came from "multiple blows" and were the equivalent of getting "hit with . . . a 2 by 4 to the face." Dr. Dakil compared it to injuries that would have resulted from "ejection from car accidents." Dr. Dakil said the injuries would have impaired Luke's ability to breathe, and he would not have behaved normally after sustaining these injuries. She said that the injuries could have resulted from an adult stomping on Luke's head when his head was on a hard floor surface because in such a situation "there's nowhere to go back so you can't reduce that force." Dr. Dakil testified that the weight loss between the summer of 2019—where Luke weighed 96 pounds at a doctor's appointment—to February 2020—where he weighed 69 pounds at autopsy—was consistent with a pattern of starvation. Dr.

Dakil testified that Luke's death was likely caused by "a continual loss of blood, hemorrhaging out into all of his tissues from all of this really deep muscular bruising…combined with muscle damage and starvation, likely led to some aspect of kidney disease or kidney injury as well. And that ultimately proved fatal."

Dr. Stephen Hastings of the Dallas County Medical Examiner's Officer testified that Luke's death was a homicide resulting from blunt force trauma to the head that had caused subdural hemorrhage in the front and back of Luke's skull. Dr. Hastings testified that, based on the lack of healing, he believed the head injuries occurred fewer than five days before Luke died. Dr. Hastings testified about "numerous extensive blunt force injuries" he saw across Luke's body. Dr. Hasting commented on injuries to Luke's buttocks as showing "an extreme amount of hemorrhage. It was impressive." Dr. Hastings said he found no food in Luke's stomach. Dr. Hastings concluded the autopsy had shown him "a child [who] was beat to death."

The State admitted evidence of three interviews the appellant gave to police in Las Vegas. In the first interview—which occurred before police found Luke's body—the appellant was speaking with Las Vegas police about an unrelated matter when he mentioned that Luke was in a mental health facility in Midland.

In the next interview, the appellant began by claiming that Luke had run away while they were staying in the hotel in Wichita Falls. When police revealed they had

8

"found [Luke]," the appellant said that Luke had fallen in the bathtub, started convulsing, and died. The appellant said that Stormy hid the body, he merely accompanied her. In the third interview the appellant admitted to hitting Luke's buttocks with a stick. In this interview the appellant said he "sparred" with Luke, hitting him mostly on the arms and chest, but on the fatal day he hit Luke once on the head then Luke had a seizure, fell, and later died.

## Sufficiency of the Evidence

In a single point of error the appellant claims the evidence is insufficient to support his conviction.

The standards for sufficiency review for criminal convictions are well settled. The evidence is sufficient if a rational factfinder could find each element of the charged offense beyond a reasonable doubt. *Williams v. State*, 582 S.W.3d 692, 700 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd). In assessing sufficiency, we must view the evidence in the light most favorable to the verdict, deferring to the factfinder's implicit credibility determinations. *See Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013) ("The jury is the sole judge of credibility . . . ."). "[W]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018) (quotation and brackets omitted). Part of viewing the evidence in the light most favorable to the verdict is that we may not indulge

alternative hypotheses that lead to inferences the jury rejected. *Melgar v. State*, 593 S.W.3d 913, 922 (Tex. App.—Houston [14th Dist.] 2020), *pet. dism'd*, No. PD-0243-20, 2022 WL 2240263 (Tex. Crim. App. June 22, 2022).

The indictment alleged the appellant intentionally or knowingly caused the death of Luke, a child between the ages of ten and fifteen,

> by repeatedly beating and assaulting [Luke] about the head and/or body and/or buttocks by the following: by punching and/or striking the face and/or body of [Luke] with the [appellant]'s hand and/or fist and/or a stick and/or a pipe and/or another object; and/or by stomping on [Luke's] head and/or face and/or body with the [appellant]'s foot and/or feet; and/or by kicking [Luke]'s body with the [appellant's] foot and/or leg; and/or by cutting [Luke]'s body with a knife and/or other sharp object.

The appellant does not contest that he caused Luke's death, nor does he contest Luke's age. He contests only whether the evidence was sufficient to prove he caused the death intentionally or knowingly. We restrict our review to that argument. *See English v. State*, No. 01-20-00139-CR, 2021 WL 4202159, at *3 (Tex. App.—Houston [1st Dist.] Sept. 16, 2021, no pet.) (mem. op., not designated for publication) (limiting sufficiency review to single element defendant challenged).

Capital murder is a result of conduct offense, meaning the evidence must prove the mental state as it relates to the result of the offense—the death of the complainant. *Louis v. State*, 393 S.W.3d 246, 251 (Tex. Crim. App. 2012). A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result. TEX. PENAL CODE § 6.03(a). A person acts

10

knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

The appellant argues, as he did to the jury, that the evidence of abuse shows he had no intent to kill Luke because he would have preferred to keep Luke alive to continue abusing him. The appellant also argues the evidence does not show he knowingly killed Luke because the State failed to introduce evidence the appellant was aware of the lethal nature of stomping on an eleven-year-old's head.

In homicide and assaultive cases, there is often no direct evidence of a defendant's state of mind. Factfinders may, and often must, infer the defendant's state of mind from circumstantial evidence. For instance, in the leading case about sufficiency review, *Jackson v. Virginia*, the Supreme Court upheld a murder conviction by holding that the factfinder could have inferred an intent to kill from the circumstances of the offense. 443 U.S. 307, 324–25 (1979). Events before and after the offense may create inferences about the defendant's state of mind. *Modarresi v. State*, 488 S.W.3d 455, 463 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

In his closing argument, the trial prosecutor analogized the appellant's abuse of Luke to that of a cat toying with a mouse before killing it: "And we know how cat and mouse ends. It's an escalating pattern, but we know how it always ends. The cat kills the mouse. That's how the game ends. It's not a question of if, but when."

11

There is ample evidence to support the jury's conclusion that the appellant's conscious desire or objective was for his abuse to cause Luke's death.

First there is the starvation. Lacy's testimony established the appellant deprived Luke of food over a long period of time. This was despite the fact that the hotel they stayed at offered a complimentary breakfast; Stormy and the appellant had ample food for themselves and Lacy (and the dogs), but Luke went hungry. The autopsy showed Luke had lost over a quarter of his body mass over just a few months, and his stomach contained no food at the time of his death. The natural consequence of long-term starvation and severe beatings is death. *See Herrera v. State*, 526 S.W.3d 800, 810 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) ("[A] jury may infer that a criminal defendant intended the natural consequences of his acts.").

Second is Lacy's testimony about the stomping. Lacy said that when the appellant stomped Luke's head, Luke began bleeding and went unconscious. She said it was obvious that Luke needed medical treatment but the appellant laughed and walked away. Dr. Dakil and Dr. Hastings both testified that it would have been obvious a child with Luke's facial injuries needed medical assistance. Lacy said she was prevented from calling 911 because the appellant said he feared going to jail.

The jury *could* have inferred the appellant did not get medical treatment for Luke because he did not want to get arrested. Another reasonable inference,

12

however, is that the appellant forbade Lacy from calling 911 because the appellant intended for Luke to die. People who intend to kill other people do not call for medical assistance after delivering a seemingly-fatal blow. As the trial prosecutor analogized, "The cat isn't getting medical attention for the mouse." This inference supports the verdict, and, viewing the evidence in the light most favorable to the verdict, we presume the jury drew this inference and we may not second guess that. *See Braughton*, 569 S.W.3d at 608 ("[W]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous.").

Lacy testified that during the period after the stomping, as Luke lingered in a semi-incapacitated state, the appellant continued to beat him with his hand and with a belt buckle. Lacy said that the appellant forbade her from touching or comforting Luke during this period. Lacy testified that during this period Luke fell off a bed and the appellant ordered Lacy to leave him on the floor. This continued abuse of, and failure to care for, an obviously incapacitated child supports an inference that the appellant intended to beat Luke to death.

Lacy's testimony about the appellant's reaction to dumping Luke's body supports an inference of intent to kill. Lacy said the appellant and Stormy returned to the hotel room "[p]roud" and acted "like they just came back from having, like, a night out." The jury could have inferred from this seeming elation at having killed and disposed of an eleven-year-old boy that Luke's death was the appellant's desired

13

result all along. *See Darby v. State*, 145 S.W.3d 714, 721 (Tex. App.—Fort Worth 2004, pet. ref'd) (defendant's lack of remorse after killing supports inference killing was intentional).

Intent may "be inferred from the extent of the injuries and the relative size and strength" of the assailant and the victim. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995); *see also Lindsey v. State*, 501 S.W.2d 647, 648 (Tex. Crim. App. 1973) ("In considering whether or not an assault was committed with the intent to murder, this Court must take into account the extent of the injuries and the relative size and strength of the parties."). The appellant was a 220-pound man who caused horrific injuries to an eleven-year-old boy who was less than half the appellant's size even before the appellant began starving him. Dr. Dakill testified that the extreme bruising on Luke's buttocks would have made it impossible to sit without pain. The appellant stomping on Luke's head left him as a "special needs child" with breathing difficulty. The nature of Luke's injuries and the size difference between Luke and the appellant support an inference that the appellant intended to kill Luke.

Viewing the evidence in the light most favorable to the verdict, it is sufficient to support a finding, beyond a reasonable doubt, that the appellant beat Luke to death with the intent to kill him. We overrule the appellant's sole point of error.

## Conclusion

We affirm the trial court court's judgment.

Clint Morgan
Justice

Panel consists of Justices Rivas-Molloy, Guiney, and Morgan.

Do not publish. TEX. R. APP. P. 47.2(b).