In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-17-00384-CR
_____

CHANDLER KYLE VENTRESS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 252nd District Court
Jefferson County, Texas
Trial Cause No. 15-22600

## MEMORANDUM OPINION

Chandler Kyle Ventress, Appellant, appeals his conviction for capital murder.

Tex. Penal Code Ann. § 19.03(a)(2) (West 2019).[1] The indictment by a grand jury

alleged that

---

[1] We cite current versions of statutes because amendments after Ventress's
offense do not affect our disposition.

1

Chandler Kyle Ventress, hereinafter styled the Defendant, on or about the 29th day of April, [2015,] . . . did then and there intentionally cause the death of . . . Mettha Chandrasire Kuruppu, by shooting [him] with a firearm, and the Defendant was then and there in the course of committing and attempting to commit the offense of Aggravated Robbery[.]

The State filed a notice waiving the death penalty, and the case was tried to a jury. The jury found Ventress guilty of capital murder as charged in the indictment. The trial court assessed punishment and sentenced Ventress to life without parole in the Institutional Division of the Texas Department of Criminal Justice.[2] The trial court certified that Ventress had the right to appeal, and he timely filed a notice of appeal.

## Issues

Ventress raises four issues on appeal. In his first issue he challenges the sufficiency of the evidence to support his conviction and argues that the State failed to prove he intentionally shot the victim. In his second, third, and fourth issues, he

---

[2] Section 12.31(a) of the Texas Penal Code provides the punishment for an individual found guilty of a capital felony. Tex. Penal Code Ann. § 12.31(a) (West 2019). In a case in which the State seeks the death penalty, the punishment will be either life without parole or death. *Id.* If the State does not seek the death penalty and the defendant is found guilty, the punishment shall be imprisonment in the TDCJ for "(1) life, if the individual committed the offense when younger than 18 years of age; or (2) life without parole, if the individual committed the offense when 18 years of age or older." *Id.* The record reflects that Ventress was almost nineteen years old at the time of the offense.

alleges the trial court erred in allowing a witness to speculate about the reaction of Ventress's two family members and girlfriend when the investigators showed them still photographs of the alleged suspects taken from surveillance video.

Evidence Presented at Trial

Testimony of Charles Young

Beaumont Police Officer Charles Young testified that shortly after midnight on April 29, 2015, he was on patrol when he received a call from his dispatch about a panic alarm call from a convenience store located at 870 South Major Drive. Officer Young testified that calls from a panic alarm go through an alarm company, and the alarm company calls the police department and then the police are dispatched, and the whole procedure can take a couple of minutes.

According to Officer Young, he and Officers Hubbard and Smith arrived at the convenience store at about twenty minutes after midnight. At that time, the lights were still on in the store, the security gates on the store were still open, and he could not see anyone inside the store. Upon arriving, the officers saw a crowbar on the ground near the door of the store, and the door was ajar. Officer Young and two other officers entered the store and split up. At first Officer Young did not see anyone behind the counter, but as he made his way around the counter, he saw the victim on the floor in a pool of blood. According to Officer Young, the victim appeared to

be deceased. Officer Young testified he followed protocol and called for EMS and called his supervisor.

At some point, the other officers ran out of the store to investigate a vehicle that left quickly from the area while Officer Young stayed at the scene. Officer Young testified that he could not recall if the officers located the vehicle or apprehended a suspect from the vehicle, and he did not see anything in the store that night that led him to believe that Ventress was involved. Officer Young testified that detectives and crime scene technicians were dispatched to the crime scene, and he stayed at the scene until he was released. Officer Young testified he later authored a report.

Testimony of Deron Simpson

Beaumont Police Officer Deron Simpson testified that on the evening in question he was part of the team of officers dispatched to the scene. Using some photographs that had been admitted into evidence, Officer Simpson testified about the crime scene and what he observed when he arrived. Upon arrival at the scene, he noticed a "crowbar in between the door." Other officers arrived at the scene at different times. He observed the victim, whom Simpson could tell was deceased, and the store was in disarray. EMS and fire personnel were already at the scene when Officer Simpson arrived.

4

Officer Simpson along with Sergeant Dischler watched "some in store security footage[,]" taken from a security camera located behind what appeared to be a false wall. Officer Simpson testified that he watched the video footage on the store computer, and he could see two men that "had masks on[]" enter the store, one of them used a crowbar to keep the door open, and one of the men had a firearm. According to Officer Simpson, he could see that the clerk was scared, and the clerk "swiped at the gun at first[]" and retrieved a BB gun that resembled a real firearm. Officer Simpson testified the video footage then shows the armed gunman fire his weapon and then he "took off outside the store." According to Simpson, video footage revealed that after the two men ran out of the store, the store clerk placed the BB gun back in a box, took his slippers off, and then collapsed. Officer Simpson observed the store clerk being shot on the videos. According to Officer Simpson, cameras are sometimes motion activated so time lapses can be explained by a lack of motion. The video footage, photographs of the scene, and the BB gun were admitted into evidence and published to the jury.

Officer Simpson agreed that, based on his training and experience as a police officer, a firearm is a deadly weapon and capable of causing serious bodily injury or death in the manner or means that it is used. He also testified that if someone

exhibited a firearm at an individual it would cause the individual to be in fear of their life and shooting someone with a firearm could cause serious bodily injury.

Testimony of Ronald Dischler

Beaumont Police Detective Sergeant Ronald Charles Dischler, Sr., testified that he was called to the scene after he received word from another sergeant that there was a major crime at that location. According to Sergeant Dischler, when he first arrived at the scene, patrol units had stopped a vehicle that had been seen leaving the area at a high rate of speed.

Sergeant Dischler described the surveillance video as showing two men enter through the door, the confrontation with Kuruppu, a slight altercation, two gunshots, two men run out after the shooting, the actions of Kuruppu after he is shot, and then Kuruppu "bleed[ing] out." Sergeant Dischler agreed that based on the surveillance video, it appeared that Kuruppu was the victim of an aggravated robbery. According to Dischler, the men that came into the store were trying to commit a theft with a gun and the men pointed the gun directly at Kuruppu. The Sergeant agreed that a gun can cause serious bodily injury or death, that based on the physical reaction of Kuruppu depicted in the video he was in fear, and that the video shows that the shot fired from the revolver at Kuruppu by one of the men led to Kuruppu's death.

6

Sergeant Dischler explained that several officers and crime scene technicians were dispatched to the scene, and a video and photographs were made of the scene before removing any of the evidence. Sergeant Dischler testified about the scene and explained what was depicted in the crime scene photographs and video. Dischler testified that the day after the incident he returned to the scene to try to find additional evidence and located two projectiles involved in the shooting: one was lying on the ground and the other was embedded in the wall directly behind the cash register.

Sergeant Dischler testified that his investigation led him to Ventress. According to Sergeant Dischler, he and Captain Holmes showed still photographs from the security video to Ventress's girlfriend and aunt. The still photographs they used were marked as Exhibits 51 and 52 and depict the shooter with a bandana over a portion of his face and pointing the gun at the store clerk. According to Sergeant Dischler, Ventress's girlfriend and aunt had distinct visible reactions to the photographs and became upset, and Dischler described their reactions as "[i]mmediate recognition." Sergeant Dischler testified that he and Captain Holmes also showed the photographs to Ventress's mother, who had the "[s]ame reaction, immediate recognition[]" of Ventress.

The Sergeant testified that Ventress came to the police station with members of his family and gave a voluntary statement, and a video recording of that statement was introduced and published to the jury. The video-recorded interview shows Ventress initially denied involvement in the matter, but later in the interview Ventress breaks down and admits to Detective Crystal Holmes and Investigator Marcelo Molfino that he shot at Kuruppu and left the store.

Testimony of Pathologist

Forensic pathologist John Wayne testified about the autopsy he performed on Kuruppu. The pathologist confirmed that the cause of death was a gunshot wound through the torso.

Testimony of Crystal Holmes

Crystal Holmes is a Captain with the Jefferson County Sheriff's Office, and she participated in the investigation and interviewed Ventress. Captain Holmes testified that law enforcement released information to the public on Crime Stoppers and began getting names and leads, and then they investigated the leads. One of the names they obtained was Chandler Kyle Ventress. Captain Holmes identified Ventress as the defendant seated in the courtroom. After Sergeant Dischler retrieved the video surveillance from the store, some still photographs were developed from the videos to show to people to see if they could identify the suspects in the photos.

8

The photos Captain Holmes used as part of her investigation were admitted into evidence and published to the jury. Captain Holmes testified that she showed one of the photographs to Ventress's girlfriend, and she told the girlfriend the police were specifically looking at Ventress as a suspect in the murder. According to Captain Holmes, when she showed the photo to the girlfriend, the girlfriend "had a visible reaction[,]" put her hands up to her face and covered her mouth and her eyes, and she was "very upset." Captain Holmes testified that from Ventress's girlfriend's reaction Holmes believed Ventress's girlfriend knew the individual in the photo. Captain Holmes testified that when she showed Ventress's aunt one of the still photographs, the aunt "placed it on the table in front of her and she put her hands up over her face and she began to cry[.]" Captain Holmes testified that she formed the conclusion from the aunt's reaction that the aunt knew the individual in the photograph to be her nephew, Chandler Ventress. Captain Holmes testified that when she showed the still photograph to Ventress's mother that his mother's physical reaction was dramatic and expressive and matched the reactions of Ventress's girlfriend and aunt.

Captain Holmes also testified that Ventress voluntarily came to the police station with his mother and his pastor and was interviewed. Captain Holmes summarized the interview and indicated that after giving Ventress his *Miranda*

9

warnings, she and Investigator Molfino questioned him and Ventress initially denied any involvement. Later during the interview, Ventress admitted that he was the person holding the gun in the photo marked as Exhibit 51 and who shot Kuruppu. Captain Holmes described the interview process to the jury and explained how Ventress at first was rigid in the interview and then relaxed, and she agreed that at some point he broke down and admitted he is the person in Exhibit 51 who shot Kuruppu. Ventress also voluntarily agreed to provide a written statement, which Captain Holmes then wrote for him based on the statement he gave in the video interview and Ventress read the written statement, made a couple of changes, and then he signed the written statement.

Captain Holmes read the written statement to the jury. According to the statement, Ventress, and a friend named Sean, were riding around in Sean's SUV, Sean told Ventress that he wanted to "hit the store at 105[,]" and Ventress told Sean, "Let's do whatever." They pulled up to the street behind the store and put on clothes that Sean had put into the SUV, and Ventress then put on his "black overshirt with the gray band on the sleeves[]" and "put the yellow bandana over the lower portion of" his face. Sean handed Ventress a gun, and Sean had something wrapped in a towel that Ventress thought was a BB gun. According to his written statement, Ventress entered the store first with the gun in his hand, he pointed the gun at the

10

clerk and told the clerk to give him the money, the clerk slapped at the gun and ducked behind the counter, Ventress saw him go down and fumble under the counter, and Ventress "turned [his] head towards the door and fired a shot as [he] took off running." According to the written statement he and Sean then ran back to the SUV, then went to Sean's house where he left the clothes and gun, and he did not know where the gun was at the time of the statement. Ventress also stated in his written statement

> I have been living with the weight on my heart since this happened. I did not mean to shoot that man. It was an accident. We just intended to go in and rob the store. I wish I could take it all back. I am so sorry. I wish I could make it up to the family and bring him back, serve them for the rest of my life, whatever it takes. This doesn't seem real.

Testimony of Investigator Marcelo Molfino

Jefferson County District Attorney's Office Investigator Marcelo Molfino testified about the interview of Appellant and provided his opinion that Ventress did not appear to be intoxicated at the time of his statement. The investigator described the procedure followed during the interview and explained how Ventress's demeanor and body language changed during the interview. The video of the interview was played for the jury. Investigator Molfino testified that he and the detectives tried to establish a rapport with Ventress during the interview, and on cross-examination Molfino acknowledged that he heard the detectives during the

11

interview refer to the shooting as an "accident" when interviewing Ventress. Molfino testified that he thought Ventress and Sean "planned a robbery and it didn't go as planned and what happened, happened."

The defendant did not testify or call any witnesses.

## Sufficiency of the Evidence

We review the sufficiency of the evidence in the light most favorable to the verdict and then determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Acosta v. State*, 429 S.W.3d 621, 624-25 (Tex. Crim. App. 2014) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). The jury is the ultimate authority on the credibility of witnesses and the weight to be given their testimony. *Brooks v. State*, 323 S.W.3d 893, 894, 901-02 (Tex. Crim. App. 2010); *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. [Panel Op.] 1981). We give deference to the jury's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1) (West 2019). "A person acts intentionally, or with intent, with respect . . . to a result of his conduct

when it is his conscious objective or desire to engage in the conduct or cause the result." *Id*. § 6.03(a) (West 2011).

The jury may infer the intent to kill from the defendant's acts, words, or conduct. *Hall v. State*, 418 S.W.2d 810, 812 (Tex. Crim. App. 1967) (quoting *Kincaid v. State*, 198 S.W.2d 899, 900 (Tex. Crim. App. 1946)), *see also Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) (stating intent may be inferred from circumstantial evidence such as acts, words, and conduct of accused); *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003) (concluding a jury may infer intent from any facts in evidence it believes prove the existence of that intent, such as the use of a deadly weapon). If the record supports conflicting inferences, we must presume that the fact finder resolved the conflicts in favor of the prosecution and defer to that determination. *See Jackson*, 443 U.S. at 326. "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W.3d at 13.

The specific intent to kill may be inferred from the use of a deadly weapon, unless the manner of its use makes it reasonably apparent that death or serious bodily injury could not have resulted. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996); *Flanagan v. State*, 675 S.W.2d 734, 744 (Tex. Crim. App. 1984) (op. on

13

reh'g); *see also* Tex. Penal Code Ann. § 1.07(a)(17)(A) (West Supp. 2018) ("deadly weapon" means "a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury"). "Naturally, the most obvious cases and the easiest ones in which to prove a specific intent to kill, are those cases in which a firearm was used and was fired or attempted to have been fired at a person." *Godsey v. State*, 719 S.W.2d 578, 581 (Tex. Crim. App. 1986). If a deadly weapon, such as a pistol, is used in a deadly manner, an intent to kill is presumed. *Adanandus v. State*, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993); *Livingston v. State*, 739 S.W.2d 311, 337 (Tex. Crim. App. 1987). A jury may infer that a defendant intended the natural consequences of his actions. *Herrera v. State*, 526 S.W.3d 800, 810 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (citing *Ruffin v. State*, 270 S.W.3d 586, 591-92 (Tex. Crim. App. 2008)). A jury may also infer a defendant's knowledge or intent from any facts tending to prove its existence, including the method of committing the crime, the nature of the wounds inflicted on the victim, and the accused's acts, words, and conduct. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002).

Ventress admitted that he went into the store with a gun and that he intended to rob the convenience store. He stated that he remembered pointing the gun at the clerk and telling the clerk to give him the money, that the clerk slapped the gun in

14

Ventress's hand and fumbled under the counter, and that Ventress then fired a shot toward the victim before running out of the store. Ventress stated in his confession that he "did not mean to shoot [Kuruppu]." The jury viewed the video footage from several angles showing the shooter enter the store and point a gun at the victim. The video footage also shows the shooter pointing the gun at the victim and shooting the victim in the chest. The jury heard the testimony of the pathologist who determined that Kuruppu's cause of death was a gunshot wound through the torso.

The jury could have inferred from the evidence, including the events depicted on the video footage, as well as the testimony from the investigating officers and the statement made by the defendant, that Ventress acted with the required mental state at the time of the shooting. After considering the evidence under the appropriate standard, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Ventress intentionally caused Kuruppu's death as alleged in the indictment. We overrule Appellant's first issue.

## Complaints About Admission of Testimony

Ventress argues the trial court committed reversible error in allowing Detective Holmes to speculate about and interpret the reactions of Ventress's girlfriend, aunt, and mother to the photographs Holmes showed them during her investigation. Holmes testified that each of the three witnesses' reactions indicated

to her that the witnesses recognized the individual in the photograph. When Holmes testified that she believed each of the three witnesses' recognized Ventress as the person depicted in the photograph, Ventress objected to the testimony as "speculation[]" about the witnesses state of mind or what they were thinking. The trial court overruled the objections. On appeal, Ventress contends that the "State's investigator Crystal Holmes was improperly allowed to testify and speculate about the reactions of appellant's family members when confronted with photographs." Ventress points out that not one of the family members who were interviewed testified, and "the admission of the rank speculation by the office[r] was reversible error[,]" and that "[t]he obvious implication of the officer's speculation was that each person recognized the perpetrator in the photograph to be appellant."

We review a trial court's decision to admit evidence under an abuse of discretion standard. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). When considering a trial court's decision to admit evidence, we will not reverse the trial court's ruling unless it falls outside the "zone of reasonable disagreement." *Gonzalez*, 544 S.W.3d at 370 (citing *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010)). We will uphold a trial court's

16

evidentiary ruling if it is correct on any theory of law applicable to that ruling. *Henley v. State*, 493 S.W.3d 77, 93 (Tex. Crim. App. 2016).

"[A]lthough police officers have training and experience, they are not precluded from offering lay testimony regarding events which they have personally observed." *Osbourn v. State*, 92 S.W.3d 531, 536 (Tex. Crim. App. 2002). Ventress did not object to Sergeant Dischler's testimony in which he concluded that Ventress's girlfriend, aunt, and mother had "[i]mmediate recognition" of Ventress in the still photograph from the murder scene, without objection. "[I]t is well settled that an error in [admitting] evidence is cured where the same evidence comes in elsewhere without objection[.]" *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991); *see also Cordero v. State*, 444 S.W.3d 812, 820 (Tex. App.—Beaumont 2014, pet. ref'd). Because Ventress failed to object to the same or similar testimony by Sergeant Dischler, Ventress cannot now successfully complain that the trial court erred by admitting the same evidence through Holmes's testimony. *See Ethington*, 819 S.W.2d at 858.

Additionally, the admission of evidence in violation of an evidentiary rule is non-constitutional error. *See Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). An appellate court must disregard non-constitutional error that does not affect a defendant's "substantial rights[.]" Tex. R. App. P. 44.2(b). A substantial right is

affected when the error had a substantial and injurious effect or influence on the jury's verdict. *King v. State,* 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). Substantial rights are not affected by the erroneous admission of evidence if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury or had but a slight effect. *Motilla*, 78 S.W.3d at 355. After examining the entire record, we conclude the error, if any, was harmless. Considering the evidence presented to the jury, the Appellant's written and video-recorded confession, and the video footage of the crime being committed, we have fair assurance that the complained-of error, if any, did not influence the jury or had but a slight effect. *Id*. Accordingly, we overrule issues two, three, and four.

Having overruled all issues raised by Ventress, we affirm the trial court's judgment.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on June 10, 2019
Opinion Delivered August 21, 2019
Do Not Publish

Before McKeithen, C.J., Horton and Johnson, JJ.