**Opinion issued December 17, 2024**



In The

# Court of Appeals

For The

# First District of Texas

_____

**NO. 01-23-00426-CR**
_____

**DRAYTON EAGLIN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 338th District Court**
**Harris County, Texas**
**Trial Court Case No. 1625033**

## O P I N I O N

A jury found Drayton Eaglin guilty of family-violence assault based on his assault of a woman with whom he was or had been in a dating relationship. This was his second offense of this sort, which elevated the crime to a felony. Taking into

account Eaglin's criminal history, the jury assessed his punishment at 40 years of imprisonment. On appeal, Eaglin asserts three issues, contending that we:

(1) must reverse the judgment and render a judgment of acquittal because the evidence is legally insufficient to prove he was in a dating relationship with the woman against whom he committed the assaultive offense; or

(2) must reverse the judgment and remand for a new trial because the record of a telephone call to emergency assistance, entered into evidence at trial and necessary to decide this appeal, has become lost or destroyed; or

(3) must abate this appeal and remand to the trial court to allow him to file an otherwise untimely new-trial motion because he was indigent and lacked appointed counsel during the period when his new-trial motion was due.

We affirm.

## BACKGROUND

Eaglin pleaded not guilty to the indictment, which alleged that he intentionally and knowingly caused bodily injury to Shana Patrice Riggs, with whom he had a dating relationship, by striking her with his hand, kicking her with his feet, and/or slamming her head into the dashboard of an automobile. The indictment further alleged that Eaglin had previously been convicted of the misdemeanor family-violence assault of another woman with whom he had a dating relationship.

The trial court initially determined that Eaglin was indigent and appointed counsel to represent him. Before trial, Eaglin retained new counsel who replaced his previously appointed counsel. This new attorney represented him during trial.

2

At the trial's outset, Eaglin stipulated that he previously was convicted of assaulting another woman with whom he had a dating relationship. This stipulation and his judgment of conviction as to this prior offense were admitted into evidence.

Two witnesses testified during the guilt–innocence phase of trial. The first witness was Riggs, the complainant. The second was a responding peace officer.

Riggs testified that on the day of the assault she attended a family barbeque. Afterward, she intended to go to a sports bar to shoot pool with Eaglin. She got into his car and the two of them headed to the sports bar, talking on the way there.

Riggs and Eaglin were friends at the time. But they had previously been in a relationship for more than a year. When Riggs told Eaglin that she had a new boyfriend, he became loud and angry. Eaglin then attacked Riggs while driving.

According to Riggs, Eaglin pulled her hair and did so hard enough to make her head swing down by the car's gear shifter. She was scared and in pain.

When Riggs tried to reach for her cellular telephone, Eaglin took it away.

Eventually, they stopped in a residential neighborhood. There, Eaglin got out of the car and came around to the passenger's side. He opened the door and grabbed Riggs by the arm, shirt, and leg to pull her out of the car. Eventually, she fell out.

Once Riggs was out of the car, Eaglin returned to the driver's side. At this point, Riggs fled on foot. But as she ran away, she was struck from behind and fell to the ground. Eaglin was then standing over her, telling her to get back up.

3

Eaglin made a telephone call on his cellular telephone. Riggs heard him tell the person on the other end, "I just beat this hoe up. Come get this bitch."

Riggs heard someone nearby as well. A stranger—an unknown lady who happened upon the scene—told Eaglin, "Leave her alone. I called the police." Eaglin responded by telling this lady, "Mind your business. This is my girlfriend."

Shortly afterward, Eaglin left. Riggs did not call the police because she did not want Eaglin to go to jail. Riggs also did not have her cellular telephone, which Eaglin kept when he left the scene, along with Riggs's car and house keys.

At this point, the call to emergency assistance placed by the stranger was admitted into evidence over the defense's hearsay objection and played for the jury. Riggs assumed the caller was the stranger in question but did not know for sure.

Subsequently, peace officers arrived at the scene of the assault. Even though Riggs was hurt, she did not provide these officers with Eaglin's correct name or other accurate identifying information. She explained, "I thought if I gave the right name and information, he was going to jail. I didn't want him to go to jail."

On cross-examination, Riggs acknowledged that before trial she provided a sworn statement to try to get Eaglin out of jail. In her pretrial statement, Riggs represented that Eaglin did not assault her. Riggs also helped pay Eaglin's bond.

Riggs also conceded that she did not go to the hospital or receive medical treatment after the assault. Therefore, no contemporaneous medical records exist.

The second witness was J. Guerrero, a peace officer with the Houston Police Department. He was dispatched to help Riggs upon receipt of the stranger's 911 call.

When Guerrero arrived at the scene, Riggs was laying on the ground "in obvious pain and distress." No one else was in the vicinity. Guerrero's body-camera footage was admitted into evidence, and a portion of it was played for the jury.

Guerrero testified that Riggs told him she was "assaulted by her boyfriend." Guerrero further testified that Riggs was short of breath, gasping for air, and crying, so that she could barely speak. She had an abrasion on her right cheek and a mark next to her left eye. Riggs's shirt was ripped, and there was some blood on it.

The prosecution then rested. The defense rested without calling witnesses.

The jury found Eaglin guilty as charged in the indictment. After hearing additional evidence relating to punishment, the jury assessed a 40-year sentence.

Fifteen days after the trial court imposed this sentence, Eaglin's trial counsel filed a notice of appeal. In the notice, counsel withdrew from the representation, stating that Eaglin "currently represents that he is not indigent and will hire counsel to represent him on appeal." In the notice, counsel also stated that Eaglin requested that the trial court order "a free record and trial transcript be provided to him."

Two days later, Eaglin, acting pro se, filed a new-trial motion. He stated the verdict was contrary to the law and evidence and alleged ineffective assistance. In addition, Eaglin asserted that he did not hire his trial counsel and was indigent.

Nothing in the record indicates that the new-trial motion was presented to the court, and the motion was overruled by operation of law, rather than denied by order.

Almost four months after the imposition of sentence, Eaglin, again acting pro se and claiming indigency, filed a motion for the appointment of appellate counsel. About a week later, Eaglin filed a second motion seeking appointment of counsel.

The trial court then appointed counsel to represent Eaglin on appeal.

## DISCUSSION

### I. Legal Sufficiency

Eaglin argues that the evidence is legally insufficient to show he was in a dating relationship with Riggs. Eaglin maintains that the evidence shows at the time of the assault they were merely friends who had previously dated one another. Eaglin further argues that because Riggs did not know various details about him, such as his current address, and did not provide his correct name to the police, the evidence shows she lacked the kind of information she would have known if the two of them were in a dating relationship. Apart from Riggs's use of the word "boyfriend," Eaglin asserts, the jury heard "no credible evidence" they were in a dating relationship.

### A. Standard of review

In reviewing a jury's verdict for evidentiary sufficiency, we must uphold its verdict if any rational trier of fact could have found all the essential elements of the offense proven beyond a reasonable doubt. *Edward v. State*, 635 S.W.3d 649, 655

6

(Tex. Crim. App. 2021). The jury's verdict is irrational under this standard only if it is based on evidence that is not legally sufficient to support a conviction. *Id.* at 655–56; *see Cary v. State*, 507 S.W.3d 761, 766 (Tex. Crim. App. 2016) (stating appellate court's role is not to act as thirteenth juror but rather is confined to ensuring jury's verdict is a rational one that is based on more than mere modicum of evidence).

In a legal-sufficiency review, we consider all the admitted evidence and view it in the light most favorable to the verdict. *Harrell v. State*, 620 S.W.3d 910, 913–14 (Tex. Crim. App. 2021). This standard recognizes it is the jury's prerogative to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Id.* at 914. So, we must defer to the jury's evaluation of the credibility of the witnesses and the weight to be given to various evidence. *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021).

An inference is a conclusion reached by considering other facts and deducing a logical consequence from them. *Anderson v. State*, 416 S.W.3d 884, 888 (Tex. Crim. App. 2013). The jury may draw inferences from the evidence so long as the evidence supports each inference. *Carter v. State*, 620 S.W.3d 147, 150 (Tex. Crim. App. 2021). When the evidence supports reasonable but conflicting inferences, we presume the jury resolved the conflict in favor of its verdict, and we defer to the jury's resolution of the conflicting inferences. *Dunham v. State*, 666 S.W.3d 477, 482 (Tex. Crim. App. 2023). The jury is entitled to this deference because it may

rely on common sense, common knowledge, personal experience, and observations from life when drawing inferences from the evidence. *Edwards v. State*, 666 S.W.3d 571, 574 (Tex. Crim. App. 2023). However, the jury's verdict cannot rest on conjecture or speculation, which are mere theorizing or guessing about the possible meaning of the facts and evidence presented, as opposed to reasonable inferences that can be drawn from the evidence admitted at trial. *Anderson*, 416 S.W.3d at 888.

Each fact need not point directly and independently to guilt, so long as the cumulative force of all the incriminating circumstances suffices to support the jury's verdict. *Walker v. State*, 594 S.W.3d 330, 335 (Tex. Crim. App. 2020). Thus, in our review, we must not use a divide-and-conquer strategy, evaluating individual bits of evidence in isolation, because this approach does not consider the cumulative force of the evidence. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Nor does the evidence need to negate every conceivable alternative to the defendant's guilt to be sufficient. *David v. State*, 663 S.W.3d 673, 678 (Tex. Crim. App. 2022).

The law does not require a particular type of evidence. *Johnson v. State*, 560 S.W.3d 224, 226 (Tex. Crim. App. 2018). Direct and circumstantial evidence are equally probative. *Id.* Circumstantial evidence alone can be legally sufficient. *Id.* We apply the same standard of review with respect to both direct and circumstantial evidence. *Hammack v. State*, 622 S.W.3d 910, 915 (Tex. Crim. App. 2021).

Finally, we reiterate that legal-sufficiency review turns on the evidence the jury saw and heard. *Harrell*, 620 S.W.3d at 913–14. Evidence that conceivably could have been admitted, but was not, does not impact the sufficiency of the evidence that was admitted. *See Murray*, 457 S.W.3d at 449–50 (holding lower appellate court erred in focusing on evidence that was not admitted at trial in its legal-sufficiency review). Nor do we compare the record in this case with the records in others to ensure that particular evidence admitted in other trials is not missing. *Id.*; *Ledford v. State*, 649 S.W.3d 731, 742 (Tex. App.—Houston [1st Dist.] 2022, no pet.).

## B. Applicable law

A person commits the crime of assault if, among other things, he intentionally, knowingly, or recklessly causes bodily injury to another. TEX. PENAL CODE § 22.01(a)(1). Usually, such an assault is a misdemeanor. *Id.* § 22.01(b). But several different circumstances may elevate an assault to a felony. *Id.* One such circumstance is when the person committing the assault and the person assaulted are or were in a dating relationship, and the person committing the assault has already been convicted of committing an assault against someone with whom he was in a dating relationship. *Id.* § 22.01(b)(2) (incorporating relationships described in TEX. FAM. CODE § 71.0021(b), which, in turn, defines phrase "dating relationship").

A "dating relationship" is statutorily defined as "a relationship between individuals who have or have had a continuing relationship of a romantic or intimate

nature." FAM. § 71.0021(b). This statutory definition encompasses both current and past relationships. *Sanchez v. State*, 499 S.W.3d 438, 442–43 (Tex. Crim. App. 2016). But a "dating relationship" does not include mere "casual acquaintanceship or ordinary fraternization in a business or social context." FAM. § 71.0021(c).

In deciding whether a "dating relationship" exists or existed, a jury must take into account the length of the relationship, nature of the relationship, and frequency and type of interaction between the two persons. *Id.* § 71.0021(b)(1)–(3). But while a jury must take these three considerations into account in its deliberations, these considerations are not standalone elements the prosecution must prove beyond a reasonable doubt in an assault prosecution that alleges the existence of a dating relationship. *See Edward*, 635 S.W.3d at 657 (holding these three considerations "are guideposts for the jury to weigh" in deciding whether there was "continuing relationship of a romantic or intimate nature," which is what must be proved).

## C.     Analysis

The evidence regarding the relationship between Riggs and Eaglin is limited. Riggs testified that at the time of the assault, she and Eaglin were friends. She also testified that they previously had been in a relationship without much detail:

Q.   Had you previously been in a relationship with the defendant?

A.   Yes.

Q.   How long had you been in that relationship?

A. Over a year.

A stranger intervened as Eaglin was assaulting Riggs. This stranger told Eaglin to leave Riggs alone and informed him that she had called the police. Riggs testified that Eaglin replied to her, "Mind your business. This is my girlfriend."

Similarly, Officer Guerrero testified that Riggs informed him after the assault that she had been "assaulted by her boyfriend." Guerrero's body-camera footage was admitted into evidence, and the portion that was played for the jury corroborates Guerrero's testimony in this regard. The first thing Riggs said to Guerrero when he arrived at the scene was: "My boyfriend beat me up." Guerrero later confirmed the identity of the assailant, asking, "Was it your boyfriend?" Riggs replied, "Yes."

In addition, as captured on the audio of Guerrero's body camera, Riggs can be heard telling another officer about the stranger's intervention and Eaglin's reply that Riggs was his "girlfriend" and the stranger should mind her own business. This evidence corroborates the testimony Riggs gave before Guerrero took the stand.

Finally, Riggs testified that the event precipitating the assault was her telling Eaglin she had a new boyfriend. It was at this point that Eaglin became loud and angry and then assaulted her. There had been no prior acrimony or violence that day. This evidence corroborates the existence of a present or past dating relationship between Riggs and Eaglin by indicating that the motive for the assault was Eaglin's anger that Riggs had moved on romantically and was no longer interested in having

11

a romantic relationship with him. Or so the jury could have reasonably inferred from the totality of the testimony and other evidence that was admitted during the trial.

Taken together, this evidence is legally sufficient to support the jury's finding that Riggs and Eaglin were or had been in a dating relationship. As the Court of Criminal Appeals has said, the use of terminology like "boyfriend" and "girlfriend" in everyday speech "by itself implies a continuing relationship of a romantic or intimate nature." *Edward*, 635 S.W.3d at 658; *see also* NEW OXFORD AMERICAN DICTIONARY 206, 734 (3d ed. 2010) (defining "boyfriend" and "girlfriend" as a regular companion with whom one "has a romantic or sexual relationship").

Though there is a conflict between Riggs's trial testimony and her statements to the police as to whether her dating relationship with Eaglin was ongoing or had ended by the time of the assault, inconsistencies of this sort are for the jury to resolve. *See Harrell*, 620 S.W.3d at 914 (advising that jury resolves evidentiary conflicts). In any event, whether their relationship was ongoing or had ended would not make a difference for present purposes, as the statutory definition of "dating relationship" encompasses both current and past relationships. *Sanchez*, 499 S.W.3d at 442–43.

As the factfinder, the jury was tasked with weighing the evidence. Based on Riggs's and Guerrero's testimony and Guerrero's body-camera footage, the jury was entitled to find that Riggs claimed Eaglin was or had been her "boyfriend" and that Eaglin likewise claimed Riggs was his "girlfriend." The jury was further entitled to

find that their romantic relationship lasted for more than a year, which is more than continuous enough to satisfy the statutory definition of "dating relationship." *See, e.g.*, *Herrera v. State*, 526 S.W.3d 800, 811 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (rejecting position that 3-week relationship was not continuous enough). Though the evidence does not divulge further details about their dating relationship, none are necessary on this record, given that their relationship was uncontested at trial. The defense neither elicited nor tried to elicit any evidence calling into question Riggs and Eaglin's dating relationship. Nor did the defense call into question whether they had a dating relationship in its opening statement or closing argument.

In short, the jury heard direct evidence of the existence of a dating relationship, and this evidence was uncontradicted by other evidence and undisputed. We hold that legally sufficient evidence supports the jury's verdict.

Citing *Edward*, Eaglin argues that the evidence held legally sufficient to establish a dating relationship in that case was more robust when compared with the evidence in this one and thereby shows the evidence to be legally insufficient here. For example, Eaglin notes that the record in *Edward* included additional circumstantial evidence beyond the use of terminology like "boyfriend" that lent further support to the existence of a dating relationship. *See* 635 S.W.3d at 658–59 (taking into account circumstances that defendant and victim were alone together in

13

apartment, defendant was found in bedroom, which is a particularly intimate space within home, and officer completed and signed family-violence form in case).

We reject Eaglin's argument for two reasons. First, the legal sufficiency of the evidence in one case generally does not depend on how it compares with the evidence in others; that some kind or type of evidence was present in another case but is missing from this one is not dispositive. *Murray*, 457 S.W.3d at 449–50; *Ledford*, 649 S.W.3d at 742. The proper inquiry is whether any rational trier of fact could have found that Riggs and Eaglin were or had been in a dating relationship beyond a reasonable doubt based on the evidence at trial. *See Edward,* 635 S.W.3d at 655 ("The verdict will be upheld if any rational trier of fact could have found all the essential elements of the offense proven beyond a reasonable doubt.").

Second, *Edward* bears no resemblance to this case. In *Edward*, circumstantial evidence about the relationship between the defendant and his victim was especially salient because neither of them testified at trial. *See id.* at 651, 653 (reciting that prosecution was unable to locate victim and indicating defense rested without presenting witnesses). And though there was some, limited direct evidence as to their relationship, it was arguably inconsistent. *See id.* at 652–53 (noting that peace officer testified victim identified defendant as her boyfriend, but that portion of his body-camera footage admitted into evidence at trial did not capture victim saying so, which peace officer acknowledged on cross-examination, and emergency medical

14

technician admitted she could not recall whether victim identified defendant as her boyfriend and had no way of knowing if dating relationship actually existed).

Moreover, in *Edward*, the defense vigorously disputed at trial whether a dating relationship existed between the defendant and his victim. *See id.* (detailing that defense cross-examined peace officer and emergency medical technician on this issue, took emergency medical technician on voir dire and objected to unredacted version of medical incident report on basis of hearsay to exclude evidence relating to this issue, and moved for directed verdict on basis that evidence was legally insufficient to permit jury to find defendant and victim had dating relationship). For this additional reason, circumstantial evidence assumed greater significance there.

In *Edward*, the Court of Criminal Appeals concluded that the totality of the evidence, including circumstantial evidence, allowed the jury to find the defendant and his victim had a dating relationship. *Id.* at 657–59. The same is true here. The totality of the evidence allowed the jury to find Riggs and Eaglin had a dating relationship, notwithstanding that the evidence in this case was mostly direct. *See Johnson*, 560 S.W.3d at 226 (instructing that direct and circumstantial evidence are equally probative as to their impact on legal sufficiency of evidence); *see also Arrellano v. State*, 555 S.W.3d 647, 651 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd) (noting testimony of single eyewitness can be legally sufficient evidence).

With respect to the direct evidence of a dating relationship, Eaglin argues Riggs's testimony in particular is insufficient to support the jury's finding that she and Eaglin had a dating relationship because she misled peace officers about his correct name and lacked other meaningful identifying information about him. Eaglin maintains that this indicates Riggs either was unable to give officers this information because she did not have a romantic or intimate relationship with him or else was lying to the officers, which discredits her testimony and renders it unbelievable.

But Riggs gave the jury an alternate explanation for her behavior, one that is consistent with a current or past romantic or intimate relationship. Namely, she explained that she thought Eaglin would end up in jail if she was truthful with the officers and misled them about Eaglin's identity to prevent this from happening. It was for the jury to decide whether or not to credit Riggs's explanation, and we cannot second-guess the jury's decision on appeal. *See Martin*, 635 S.W.3d at 679 (advising that appellate courts must defer to jury's evaluation of credibility of witnesses). To the extent Eaglin contends Riggs's testimony is simply false or unbelievable, he presents nothing for review because credibility determinations of this sort belong to the jury alone. *See Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (holding appellant's argument that witness's "testimony was false and not credible" played no part in legal-sufficiency review, given deference to jury on credibility).

We overrule Eaglin's challenge to the legal sufficiency of the evidence.

## II.     Missing Exhibit

Eaglin argues that the recording of the telephone call the stranger made to emergency assistance, which the prosecution introduced into evidence at trial, has since been lost or destroyed. Because this missing trial exhibit is necessary to resolve his appeal, Eaglin argues, this court must reverse and remand for a new trial.

### A.     Standard of review and applicable law

An appellant is entitled to a new trial when the reporter's record, or some portion of it, has been lost or destroyed under the following circumstances:

(1)  if the appellant has timely requested a reporter's record;

(2)  if, without the appellant's fault, a significant exhibit or a significant portion of the court reporter's notes and records has been lost or destroyed or—if the proceedings were electronically recorded—a significant portion of the recording has been lost or destroyed or is inaudible;

(3)  if the lost, destroyed, or inaudible portion of the reporter's record, or the lost or destroyed exhibit, is necessary to the appeal's resolution; and

(4)  if the lost, destroyed or inaudible portion of the reporter's record cannot be replaced by agreement of the parties, or the lost or destroyed exhibit cannot be replaced either by agreement of the parties or with a copy determined by the trial court to accurately duplicate with reasonable certainty the original exhibit.

TEX. R. APP. P. 34.6(f). Each of these circumstances must exist in order for a new trial to be warranted, and the appellant bears the burden to establish these circumstances. *Routier v. State*, 112 S.W.3d 554, 571 (Tex. Crim. App. 2003).

The reporter's record, or some portion of it, is lost or destroyed only if it is "irretrievable." *Johnson v. State*, 151 S.W.3d 193, 196 (Tex. Crim. App. 2004).

17

Therefore, a court reporter's mere failure to file the record, for example, does not in and of itself render the reporter's record, or some part of it, lost or destroyed. *Id.*

The requirement that a lost or destroyed portion of the record must be "necessary to the appeal's resolution" bars reversal and remand for a new trial when the missing portion of the record's absence is harmless. *Nava v. State*, 415 S.W.3d 289, 306 (Tex. Crim. App. 2013). The mere suggestion that a lost or destroyed portion of the record potentially could have assisted the appellant on appeal does not show that it is necessary to resolve the appeal. *Routier*, 112 S.W.3d at 571.

## B.    Analysis

As a threshold matter, Eaglin must show "that a significant portion of the record was lost or destroyed." *Id.*  Eaglin has failed to make this showing.

Eaglin claims the 911 call made by the stranger is lost or destroyed because when the court reporter filed this exhibit, the recording was "empty," meaning that the electronic file was either missing altogether or did not contain the recording.

However, the court reporter later refiled "another copy" of the 911 call after she "was informed by the defense attorney handling the appeal that the original CD that was filed and received by the COA was blank." Thus, there is no indication in this record that the 911 call in question is lost or destroyed, as opposed to having been initially unfiled through inadvertence or error. *See Johnson*, 151 S.W.3d at 196

18

(stating court reporter's failure to file record does not, standing alone, show new trial is necessary because reporter's record, or some portion of it, is lost or destroyed).

On the contrary, the refiled exhibit is in the appellate record. It contains the recording of the 911 call made by the stranger, and it is in an accessible format.

In addition, even if the 911 call was lost or missing, Eaglin would also have to show that it is necessary to resolve his appeal. *See Routier*, 112 S.W.3d at 571 (stating appellant must show missing portion is necessary). He has not done so.

Eaglin argues the 911 call is necessary in part because the stranger who placed the call stated that an assailant was attacking a woman and thus constituted evidence that Eaglin committed the assault alleged by the prosecution. On appeal, however, Eaglin does not challenge the legal sufficiency of the evidence as to the assault; his sole legal-sufficiency challenge concerns the existence of a dating relationship. Eaglin does not claim that the 911 call has any bearing on the existence of a dating relationship. Hence, the call is not necessary on appeal. *See Gomez v. State*, 35 S.W.3d 746, 749 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (holding that missing post-arrest video was not necessary to resolve appeal because issues appellant raised were completely evaluable without it); *cf. Bryant v. State*, 464 S.W.3d 99, 103 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (per curiam) (holding complete lack of reporter's record as to entire trial made it impossible for appellant to challenge sufficiency of evidence and showed record was necessary).

19

Eaglin also argues that the 911 call is necessary to resolve his appeal because the stranger who made the call did not testify at trial, such that the admission of the call into evidence violated his constitutional right to confront the witnesses against him. On appeal, however, Eaglin has not challenged his conviction on this basis. That is, he does not contend that we must reverse his conviction based on this ostensible violation of the confrontation clause, and Eaglin cannot establish that the 911 call is necessary to his appeal simply by claiming that he might have asserted a violation of the confrontation clause on appeal if the call had not been lost or destroyed. *See Routier*, 112 S.W.3d at 571 (holding prospective juror instructions missing from record were not necessary to resolve appeal because appellant did not include "point of error regarding the instructions given to prospective jurors" and mere "suggestion" instructions may have been erroneous did not show necessity).

Similarly, Eaglin argues that the 911 call is necessary to resolve his appeal because the call is needed to assess whether the trial court should have excluded it from the evidence and to evaluate whether his trial counsel provided ineffective assistance in failing to object to its admission on some ground or by failing to take some other action in response to the call's admission into evidence. Like his confrontation-clause argument, however, Eaglin does not assert on appeal that the trial court erred in admitting the 911 call or that his trial lawyer provided ineffective assistance. His implicit claim—that he might have raised one or both of these issues,

depending on what the contents of the purportedly missing 911 call revealed—is insufficient to establish the call is necessary to resolve his appeal. *See id.*

In sum, the 911 call is not lost or destroyed. Nor is the call necessary to resolve this appeal. Hence, we overrule Eaglin's challenge concerning the 911 call.

## III.    Right to Counsel

Eaglin argues that he is indigent and therefore was entitled to appointed counsel when his retained lawyer withdrew from the representation after trial. Eaglin maintains that the trial court erred in failing to appoint new counsel to represent him while there was still time to file a motion for new trial, which resulted in him being unassisted by counsel in violation of his constitutional right to legal representation.

### A.    Standard of review and applicable law

A criminal defendant need not file a motion for a new trial to present an issue on appeal, unless the appellate presentation of the issue depends on evidence that is not already in the record. TEX. R. APP. P. 21.2. Necessary or not, if a defendant wishes to file a motion for a new trial, he generally must do so no later than 30 days after the trial court imposes his sentence in open court. TEX. R. APP. P. 21.4(a).

Because the period in which a motion for a new trial is due to be filed constitutes a critical stage of the proceedings, a defendant has a constitutional right to counsel during this time. *Cooks v. State*, 240 S.W.3d 906, 911 (Tex. Crim. App. 2007). Thus, if an indigent defendant is deprived of counsel during this time, he may

be entitled to an abatement of his appeal to file a new-trial motion outside of the usual deadline. *See, e.g.*, *Monakino v. State*, 535 S.W.3d 559, 569 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (abating appeal, restarting appellate timetable, and remanding to trial court to allow filing of out-of-time motion for new trial).

Assuming a defendant was deprived of counsel at this critical stage of the proceedings, his entitlement to an abatement and remand turns on whether the deprivation harmed him. *Cooks*, 240 S.W.3d at 911. Because the deprivation of counsel is constitutional in magnitude, an appellate court must abate and remand unless it determines the deprivation was harmless beyond a reasonable doubt. *Id.*

Deprivation of counsel during the period for filing a motion for new trial is harmless beyond a reasonable doubt if the defendant does not present a facially plausible claim that could have been presented in the motion. *Id.* at 911–12. A conclusory claim—one that does not identify the evidence or information that would have been revealed by a new-trial motion and explain how this evidence or information could have changed the outcome—is not a facially plausible one. *Id.*

In sum, the dispositive test is twofold. To be entitled to abatement and remand, an indigent defendant must have been deprived of counsel during the period in which a new-trial motion is due, and the deprivation of counsel must have harmed him. *Id.* The defendant bears the burden to make both of these showings. *Id.*; *Bearman v. State*, 425 S.W.3d 328, 330, 331–32 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

**B. Analysis**

**1. Deprivation of counsel**

In *Bearman*, our court held an indigent defendant was deprived of his constitutional right to counsel, given his lack of representation for a significant portion of the 30-day period in which a motion for new trial was due. 425 S.W.3d at 329–30. There, the defendant filed his notice of appeal and his trial lawyer withdrew from the representation two weeks after sentencing. *Id.* Afterward, the trial court did not appoint appellate counsel to represent the defendant until after the remaining time for filing a new-trial motion had already expired. *Id.* Having been unrepresented for a little bit more than half of the period in which a new-trial was due, we held the record showed the defendant was deprived of his right to counsel. *Id.* at 330.

This case resembles *Bearman* in some respects. As there, Eaglin was only represented for a portion of the time during which his new-trial motion was due. Eaglin filed his notice of appeal and his trial lawyer withdrew from the representation 15 days after sentencing. Afterward, the trial court did not appoint appellate counsel to represent Eaglin until after the period for filing a new-trial motion had already expired. As a result, like the defendant in *Bearman*, Eaglin was unrepresented for half the time before the deadline for a new-trial motion expired.

Without citing *Bearman*, Eaglin essentially argues the principles set forth in it are dispositive here because the record in this case likewise shows he was indigent

23

and thus entitled to be represented by counsel during the period in which his new-trial motion was due. He reasons that the trial court found him indigent and appointed counsel to represent him more than four years before trial, and Texas law provides that a criminal defendant who is found indigent "is presumed to remain indigent for the remainder of the proceedings in the case unless a material change in the defendant's financial circumstances occurs." TEX. CODE CRIM. PROC. art. 26.04(p). Eaglin further reasons that because the record does not contain evidence, let alone a finding, of a material change in his financial circumstances since the trial court found him indigent, he was entitled to the appointment of counsel when his trial lawyer withdrew. *See Cates v. State*, 402 S.W.3d 250, 251–52 (Tex. Crim. App. 2013) (holding there was no basis in record to support order to pay portion of court-appointed attorney's fees, given that trial court had found defendant was indigent and had not since found that he was able to pay any amount of these fees).

The State counters that other facts show Eaglin was not deprived of his right to counsel. The record shows that about seven months before trial, Eaglin replaced his appointed trial lawyer with a retained one, who then represented him until she withdrew after trial. The record also shows that in the consolidated notice of appeal and withdrawal, Eaglin's retained lawyer represented that Eaglin stated he was not then indigent and would hire an appellate lawyer. In this regard, the notice specifically stated: "The defendant currently represents that he is not indigent and

24

will hire counsel to represent him on appeal." Eaglin, the State maintains, did not move for the appointment of counsel until more than four months later, long after the deadline for a new-trial motion had passed. Accordingly, the State posits that these circumstances either rebut the presumption of indigency or else render it inapplicable because Eaglin waived the right to appointed counsel during the 30-day period in which a new-trial motion was due by not timely invoking this right.

On this record, we agree with the State that the presumption of continued indigency is inapplicable. When Eaglin appealed, his retained lawyer, who was withdrawing from the representation, advised the trial court in writing that Eaglin reported he was not then indigent and would hire appellate counsel. This express disavowal of indigency with a representation that appellate counsel would be hired waived the right to have a lawyer appointed upon his retained lawyer's withdrawal. *See Gilley v. State*, 418 S.W.3d 114, 119 (Tex. Crim. App. 2014) (indicating that right to counsel at critical stage of proceedings can be affirmatively waived).

To adopt Eaglin's contrary position would allow criminal defendants to manufacture error by disclaiming the need for appointed counsel in the trial court but insisting on appeal that the trial court deprived them of their right to counsel by failing to make such an appointment. An appellate party cannot complain of an ostensible error it caused below, even when the error in question is fundamental in nature. *Woodall v. State*, 336 S.W.3d 634, 644 (Tex. Crim. App. 2011); *see also*

*Ruffins v. State*, 666 S.W.3d 636, 643 (Tex. Crim. App. 2023) (holding appellant could not assert position on appeal that was inconsistent with his trial conduct). So, if the trial court erred by not appointing counsel when Eaglin's retained lawyer withdrew, Eaglin led the court into this error and cannot challenge it on appeal.

Moreover, even if we did not construe the consolidated notice of appeal and withdrawal as an affirmative waiver of the right to appointed counsel, we would reject Eaglin's position that he was entitled to appointed counsel based on the presumption of continued indigency because evidence rebuts the presumption. Our court has held that the replacement of appointed counsel with retained counsel after a finding of indigency rebuts the presumption of continued indigency. *Easily v. State*, 248 S.W.3d 272, 281 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). Here, it is undisputed that retained counsel replaced appointed counsel well before trial.

Without acknowledging *Easily*, Eaglin argues that the retention of counsel, standing alone, "is not determinative" of indigency because others might well be footing the bill for a retained lawyer due to a defendant's inability to afford one.

We have no quarrel with the underlying premise of Eaglin's argument. The retention of counsel in lieu of a court-appointed lawyer is not necessarily determinative of whether a defendant remains indigent. This is so because it is not uncommon for relatives or others to pay a lawyer to represent an indigent defendant with their own resources, and their resources usually do not negate the defendant's

indigency. *See* TEX. CODE CRIM. PROC. art. 26.04(m) (stating courts "may consider the defendant's income, source of income, assets, property owned, outstanding obligations, necessary expenses, the number and ages of dependents, and spousal income that is available to the defendant" in deciding if defendant is indigent).

But we reject the conclusion Eaglin draws from this premise because his argument misapprehends how the presumption set forth in Article 26.04(p) of the Code of Criminal Procedure works. Evidence need not be conclusive—or determinative, as Eaglin puts it—to rebut this presumption. In general, a presumption operates when no contrary evidence exists. *See, e.g.*, *Ross v. State*, 133 S.W.3d 618, 624 (Tex. Crim. App. 2004) (explaining no evidence rebutted presumption that jury follows instructions so that presumption was dispositive). If contrary evidence exists, however, the presumption no longer operates. *See, e.g.*, *Jenkins v. State*, 493 S.W.3d 583, 616 (Tex. Crim. App. 2016) (stating that presumption jury follows instructions applies absent contrary evidence). In this way, a presumption supplies a default rule in the absence of contradictory evidence. *See Presumption*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "legal presumption" or "presumption of law" as "assumption that a court is required to make if certain facts are established and no contradictory evidence is produced"). As we held in *Easily*, this is how Article 26.04(p) works. *See* 248 S.W.3d at 281 (holding presumption of continued indigency "disappeared" when defendant

27

previously found indigent replaced court-appointed counsel with retained lawyer because this was evidence of material change in his financial circumstances). Because there is contrary evidence—evidence of a material change in Eaglin's financial circumstances that calls into question his indigency—the presumption of continued indigency was rebutted and no longer operated in this case. *Id*. Thus, the presumption did not obligate the trial court to treat Eaglin as an indigent and appoint appellate counsel when his retained trial lawyer withdrew from the representation.

Setting aside the presumption of continuing indigency, Eaglin further argues that additional evidence in the record shows he remained indigent. Based on this additional evidence, Eaglin maintains the trial court deprived him of his right to counsel by failing to appoint appellate counsel to represent him during the period in which a new-trial motion was due, notwithstanding his withdrawing lawyer's representation that Eaglin was not indigent and would hire appellate counsel.

Eaglin relies on two additional circumstances in particular. First, Eaglin argues that the trial court should not have "ignored" his timely pro se motion for a new trial. In his new-trial motion, he argued that his retained trial lawyer had rendered ineffective assistance at trial. As part of his ineffective-assistance argument, Eaglin claimed that his lawyer was ineffective in part by failing to withdraw or ask for a continuance, actions he requested she take in part because he had not hired her. In addition, Eaglin claimed his lawyer refused to file motions on

his behalf because she was owed money, he was indigent, and he had not hired her. On appeal, Eaglin relies on this assertion of indigency as evidence that should have prompted or required the trial court to appoint new counsel to represent him.

The record, however, does not show that Eaglin presented his pro se new-trial motion, which was overruled by operation of law, to the trial court. Unless a defendant presents his new-trial motion to the trial court by giving the trial court actual notice of the filing and requesting a hearing, the motion does not preserve error. *Obella v. State*, 532 S.W.3d 405, 407 (Tex. Crim. App. 2017) (per curiam); *see also Gardner v. State*, 306 S.W.3d 274, 305 (Tex. Crim. App. 2009) (reiterating presentment must be apparent from record for new-trial motion to preserve error). Because the record does not show the trial court was ever made aware of his new-trial motion, Eaglin cannot argue on appeal that the court erred by disregarding it.

Moreover, Eaglin's motion was unsworn. Allegations in an unsworn post-trial motion, like Eaglin's new-trial motion, are not self-proving. *Rouse v. State*, 300 S.W.3d 754, 762 (Tex. Crim. App. 2009). Thus, even if Eaglin had presented his motion to the trial court, the court would not have been obliged to credit his claims. *See id.* at 762–63 (holding rule that unsworn allegations are not self-proving applies even when new-trial motion involves issues of constitutional magnitude).

We understand that Eaglin was acting pro se when he filed his motion for a new trial, and we sympathize with the predicament of unrepresented defendants who

29

must navigate the requirements the law imposes to raise and preserve issues for review. There is some added irony when, as here, these requirements trip up an unrepresented defendant whose very complaint is that he was unrepresented. But all defendants must satisfy these requirements, whether they are represented or not. *Minjares v. State*, 577 S.W.2d 222, 224 (Tex. Crim. App. [Panel Op.] 1978); *see also Perez v. State*, 261 S.W.3d 760, 763 n.2 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (construing brief liberally in terms of issues it raised on account of pro se status of appellant but holding him to same law and procedural rules, including those involving preservation, that apply to appellants represented by counsel).

Second, Eaglin relies on his request for a free record and trial transcript, which his retained lawyer included in the consolidated notice of appeal and withdrawal. The trial court granted this request during the period for moving for a new trial, which, Eaglin maintains, shows the trial court understood he remained indigent and therefore was obligated to immediately appoint a new lawyer to represent him.

Once again, we accept the premise that underlies Eaglin's argument. Specifically, we recognize that a criminal defendant is entitled to a free record on direct appeal if and only if he qualifies as indigent. *Easily*, 248 S.W.3d at 277.

But we disagree with the conclusion Eaglin draws from this shared premise because he fails to account for the distinction the law draws between different kinds of indigence. Whether a defendant is entitled to a free record or the appointment of

counsel are discrete inquiries, with the former turning on his financial ability to pay or give security for the appellate record and the latter turning on his financial ability to retain counsel. *McFatridge v. State*, 309 S.W.3d 1, 5–6 (Tex. Crim. App. 2010). When a trial court evaluates a defendant's financial ability for either purpose, it considers the same factors. *Id.* at 6 & n.16 (relying on TEX. CODE CRIM. PROC. art. 26.04(m), which specifies that indigency is a function of "the defendant's income, source of income, assets, property owned, outstanding obligations, necessary expenses, the number and ages of dependents, and spousal income that is available to the defendant"). But a given defendant's financial ability may enable him to pay for the record but not retain counsel or vice versa, such that he "can be found indigent for one purpose without being found indigent for the other." *Id.* at 6; *see, e.g.*, *Whitehead v. State*, 130 S.W.3d 866, 878 (Tex. Crim. App. 2004) (noting defendant can be indigent for one purpose but not the other and citing, as example, decision in which defendant was able to retain counsel but unable to afford record on appeal).

In the consolidated notice of appeal and withdrawal, Eaglin's retained counsel expressly disavowed indigency for the purpose of the appointment of counsel, representing that his client would hire a lawyer to represent him on appeal, and requested that his client receive a free record and trial transcript. Given that a criminal defendant can be indigent for one purpose and not another, the notice is not inconsistent in the way Eaglin suggests. *McFatridge*, 309 S.W.3d at 6; *Whitehead*,

31

130 S.W.3d at 878. In the absence of additional evidence concerning Eaglin's financial ability and the respective costs of the appellate record and appellate counsel, we cannot conclude that the trial court was required to find Eaglin indigent for both of these purposes. The record before us simply lacks this evidence.

Here, the trial court granted Eaglin the relief requested in the consolidated notice of appeal and withdrawal of counsel—a free record. But the notice did not include a like request for the appointment of counsel; on the contrary, the notice informed the trial court that Eaglin would instead hire a lawyer to represent him on appeal. Eaglin did not move for the appointment of appellate counsel until much later, after the period for seeking a new trial had expired, but when he did so, the trial court again granted the relief requested—the appointment of counsel. On this record, we hold Eaglin has not shown that he was deprived of his right to counsel.

## 2. Harm or prejudice

Even if Eaglin could establish that he was deprived of his right to representation at a critical stage of the proceedings, he would also have to show that this deprivation harmed him. Eaglin, however, has also failed to show any harm.

The deprivation of counsel Eaglin claims is harmless beyond a reasonable doubt unless he can show it prevented him from presenting a facially plausible claim in a motion for a new trial. *Cooks*, 240 S.W.3d at 911–12. To make this showing,

Eaglin must identify the evidence or information that would have been revealed by his new-trial motion and explain how this could have changed the outcome. *Id.*

On appeal, Eaglin argues that his trial lawyer rendered ineffective assistance by missing "numerous avenues of investigation and case presentation." He further argues that these lapses would have been presented in a motion for a new trial if he had counsel at this critical stage in the proceedings. In particular, Eaglin asserts that the following issues would have been explored in a new-trial motion:

- the extent of his trial lawyer's investigation before advising him to reject the State's plea offer;

- the extent of his trial lawyer's investigation into mitigating evidence and punishment-related issues;

- the contents of his trial lawyer's file and what it might reveal regarding plea negotiations and case investigation;

- the strategic considerations, if any, informing various decisions made by his trial lawyer; and

- whether his trial lawyer was ineffective when she challenged the admissibility of the 911 call.

But Eaglin merely identifies these as subjects that merit inquiry. He does not identify what evidence or information would result from any such inquiry and then be presented in a new-trial motion, let alone explain how this unidentified evidence or information could have altered the outcome at trial. While Eaglin need not marshal all the evidence his proposed lines of inquiry would have revealed, he cannot show that he lost the opportunity to present facially plausible claims in a new-

33

trial motion simply by identifying issues counsel could have investigated that potentially might have led to the presentation of ineffective-assistance arguments. *Id.*; *see also Griffith v. State*, 507 S.W.3d 720, 722 (Tex. Crim. App. 2016) (Hervey, J., concurring) ("To make a 'facially plausible' claim, a defendant is not required to marshal all evidence germane to potential ineffective-assistance-of counsel claims, but he has to do more than just listing things trial counsel may have possibly done (or not done) that could possibly constitute ineffective assistance of counsel.").

Even when Eaglin makes a more specific complaint concerning his trial lawyer's performance, he does it in so conclusory a fashion that the complaint does not show he lost the chance to present a facially plausible ineffective-assistance claim. For example, he faults his trial lawyer because she did not "interview any witnesses." But Eaglin does not identify the persons who could have testified for the defense, describe the testimony of these proposed witnesses, or explain how their testimony would have changed the trial's outcome. He does vaguely suggest that one witness could have supplied him with an "alibi on the night of the incident." Eaglin, however, does not name this alibi witness or outline this witness's proposed testimony. Eaglin does not even state the nature of the alibi in general terms.

Similarly, Eaglin faults his trial lawyer because she "did not file any motions." But he neither specifies what motions she should have filed nor explains what these unspecified motions would have achieved. Their purposes are not mentioned. Eaglin

34

likewise faults his trial lawyer for not filing a proposed jury charge. He does not, however, identify any inadequacy in the jury charge given by the trial court, specify what questions or instructions his lawyer should have filed but did not, or explain how the outcome would have differed if his lawyer filed a proposed jury charge.

Eaglin also faults his trial lawyer for supplying "very little counterweight by way of mitigation" during the trial's punishment phase. Had she investigated his background, he says she could have tempered his criminal history "with the context of his life story." Eaglin does not describe the omitted evidence, not even his personal background, even though he is uniquely knowledgeable on this subject. To be sure, he does conclusorily suggest an investigation could turn up meaningful evidence of "lack of adequate supervision, neglect, and serious substance abuse during childhood." But Eaglin's briefing does not unequivocally assert that evidence of this kind exists, state who would provide this evidence in testimonial or other form, or offer any details whatsoever regarding his childhood circumstances.

The most specific information about his personal background that Eaglin gives consists of a suggestion, made in a footnote, that he may be mentally ill or intellectually disabled. In support, he references a referral for evaluation that was made in this case more than four years before trial. *See* TEX. CODE CRIM. PROC. art. 16.22 ("Early identification of defendant suspected of having mental illness or

35

intellectual disability"). But Eaglin does not actually assert he has either condition. Nor does he claim his evaluation resulted in him being diagnosed with either one.

Ultimately, the preceding ineffective-assistance complaints are speculative. Eaglin generally asserts that if his trial lawyer had taken various actions, these actions might have unearthed helpful evidence or information or assisted him in some other unspecified way at trial. But the articulation of vague possibilities does not suffice to show the existence of facially plausible claims, and the existence of facially plausible claims is necessary to demonstrate harm or prejudice resulting from the deprivation of the right to counsel with respect to the preparation and presentation of a motion for new trial. *See Cooks*, 240 S.W.3d at 912 (concluding appellant's assertions that lawyer was ineffective by failing to call named witness and investigate case did not establish facially plausible ineffective-assistance claims because appellant did "not set out what evidence or information" would have been revealed "that reasonably could have changed the result of this case").

Eaglin posits one final ineffective-assistance claim that fares no better than the preceding ones but merits separate discussion. Relying on his pro se new-trial motion in support, he argues that with the assistance of appointed counsel he could have presented a facially plausible claim that his trial lawyer was ineffective by denying his constitutional right to testify in his own defense. In his pro se new-trial

motion, Eaglin stated without elaboration: "I was denied a chance to defend myself. The trial lawyer said 'it wouldn't be wise.' I insisted and I wasn't allowed."

To be clear, Eaglin does not argue the trial court erred in denying him the right to testify at trial. He claims his trial lawyer denied him this right, and that his trial lawyer provided ineffective assistance by disallowing his testimony. In assessing whether this constitutes a facially plausible claim, we are mindful that, like all of Eaglin's other ineffective-assistance claims, this one is subject to the conventional test for ineffective assistance, which requires a showing of deficient performance and prejudice. *Johnson v. State*, 169 S.W.3d 223, 225 (Tex. Crim. App. 2005).

Assuming the factual assertions Eaglin makes in his pro se new-trial motion would suffice to prove deficient performance if they were credited by the factfinder, we conclude that he has not made a facially plausible claim that this deficiency—his lawyer's denial of his right to testify in his own defense at trial—harmed him. To do so, Eaglin would have to plausibly maintain that there is "a reasonable probability that the outcome of the proceeding would have been different had his attorney not precluded him from testifying." *Id.* at 239. But Eaglin has not even tried to do so.

Eaglin has not specified whether he would have testified during the guilt–innocence phase, the punishment phase, or both. He has not described what testimony he would have given in general or with respect to particular matters. Elsewhere in his new-trial motion, Eaglin refers to an unnamed alibi witness. We

assume, therefore, that Eaglin would have testified that he did not assault Riggs. But that is no more than an assumption. Even if it is a correct assumption, we do not know what exactly Eaglin would have said on the stand. Nor, of course, do we know what sort of testimony might have been elicited on cross-examination. As a result, we cannot say that if Eaglin had been allowed to testify there is a reasonable probability that the outcome would have been more favorable to him in some regard, such as an acquittal or a more lenient sentence, without resorting to wholesale conjecture about the details of Eaglin's testimony. An appellant cannot rely on conjecture of this sort to show a reasonable probability of a better outcome. *See Ex parte Cash*, 178 S.W.3d 816, 818 (Tex. Crim. App. 2005) (rejecting ineffective-assistance claim because claimed prejudice was based on "pure conjecture").

Based on the limited record before us and the barebones nature of his arguments on appeal, Eaglin has not shown that the alleged deprivation of appointed counsel prevented him from presenting a facially plausible claim in a new-trial motion that his trial lawyer was ineffective by denying him the right to testify.

We hold that even if Eaglin could show he was deprived of the right to be represented by counsel during a critical stage of the proceedings, he has not shown that this deprivation harmed him. To the contrary, we conclude that the deprivation of counsel that Eaglin asserts on appeal was harmless beyond a reasonable doubt.

We overrule Eaglin's complaint as to the right to be represented by counsel.

38

## CONCLUSION

We affirm the trial court's judgment.

Gordon Goodman
Justice

Panel consists of Chief Justice Adams and Justices Goodman and Guerra.

Publish. TEX. R. APP. P. 47.2(b).